TMr. Justice WAYNE
 

 delivered the opinion of the court.
 

 • .This cause has been brought to-thi's court,to get its decision upon questions of law, which were raised upon a case stated in the Circuit Court, upon which the judges of that court differed in opinion.
 

 The suit is an action of ejectment, for the undivided third part of eight dots .of land, in the sixteenth ward of the city of New York.;. .'.The plaintiffs claimed under the will of Mary Clarke;-' It wastadmitted by the counsel for the defendant, that Mary Clarke; had :been seized of the premises in dispute, when she made her will;, and when she died in 1802. It was also admitted, that the- defendant was the actual occupant of the premises, when the suit was commenced against him.
 

 The premises are a portion of a tract of land, devised by Mary Clarke to “ Benjamin Moore and Charity, his wife, and Elizabeth Maunsell, and their heirs for ever, as joint tenants and not as tenants in common,” of “ all that part of my said farm at Greenwich aforesaid, called Chelsea,” &c.,
 
 “ to
 
 have and to hold the said hereby devised premises, to the said Benjamin Moore and Charity, his wife, and Elizabeth Maunsell, and to the survivor or survivors of them, and to the heirs of such survivor, as joint tenants, and not as tenants in common, in trust, to receive the rents, issues, and profits thereof, and to pay the same ”. “ to Thomas B. Clarke, ” &c.,
 
 “
 
 during his natural life ; and from and after the death of the said Thomas B. Clarke, in further trust, to convey the same in fee, to the lawful issue of the said Thomas B. Clarke, living at his death. And if the said Thomas B. Clarke shall.not leave any lawful issue, at the time of his death, then in the further trust and confidence, to convey the said hereby devised premises to my grandson, Clement C. Moore, and to his heirs, or to such person in fee as he may by will appoint, in case of his death, prior to the death of Thomas B. Clarke.”
 

 
 *532
 
 It was also admitted, that the trustees named in the will were dead; that Thomas B. Clarke married, in 1803 ; that his wife died in 1815; and that he died in 1826, leaving three children, — Catharine, the wife- of Charles H. Williamson, plaintiffs in this suit, — Isabella, now the wife of Rupert Cochran, — and Bayard Clarke, all of whom were still living. Here the plaintiffs rested their case.
 

 The defendant then put his case upon conveyances from Thomas B. Clarke, made, as he says, under legislative enactments of the State of New York and orders of the.Chancellor of New York.
 

 The acts and the orders of the Chancellor under them will be the subjects of our consideration only so far as may be necessary to give answers to the points certified to this court. In other words, we will not discuss the quantity of interest which the persons provided for in the devise took under it.
 

 It is right, however, to say, that we concur with the learned judges of the Circuit Court, that, under the will of Mary Clarke, the first-born child of Thomas B. Clarke, at its birth, took a vested estate in remainder, which opened to let in his other children to the like estate, as they were successively
 
 born;
 
 and that their vested remainder became a fee simple absolute, in the children living, on the death of their father.
 

 The points certified are as follows: —
 

 1. Whether the acts of the Legislature, stated in the case, divested the estate of the trustees under the will of Mary Clarke, and vested the whole estate in fee in Thomas B. Clarke.
 

 2. Whether the authority given by the said acts to the trustee to sell, was a special power, to be strictly pursued, or whether he was vested with the absolute power of alienation, subject only to reexamination and account in equity.
 

 3. Whether the orders set forth in the case, made by the Chancellor, were authorized by and in conformity to the said acts of the Legislature, and are to be regarded as the - acts of the Court of Chancery, empowered to proceed as such in that behalf, or the doings of an officer acting under a special authority.
 

 4. Whether the Chancellor had competent authority, under the acts, to order or allow such sale or conveyance of the estate by the trustee, as is stated in the case, on any other consideration than for cash' paid on said conveyance.
 

 5. Whether the deed executed' by Thomas B. Clarke to George De Grasse, for- the premises in question, being upon a consideration other than for cash paid • on the purchase, is valid.
 

 
 *533
 
 6. Whether the said deed is valid, it having no certificate indorsed thereon that it was approved by a master in chancery.
 

 7. Whether Thomas B. Clarke, having previously mortgaged the premises in fee to Henry Simmons, had competent authority to sell and convey the same to De Grasse.
 

 8. Whether the subsequent conveyance of the premises, as set forth in the case, made by George He Grasse, rendered the title of such grantee, or his assigns, valid against the plaintiffs.
 

 It is thereupon, on motion of the plaintiffs by their counsel, ordered that a certificate of division of opinion, upon the foregoing points, which are here stated during this same term, under the direction of the said judges, be duly certified under the seal of this court to the Supreme Court of the United States, to be finally decided.
 

 Our first observation upon the act of April, 1814, is,' that the first section of it gives to the Chancellor the power to appoint trustees, in the place of those named in the will. This is to be done upon the petition of Thomas B. Clarke, as contradistinguished from a suit- by bill for such a purpose; and as occasion may require, the Chancellor may substitute and appoint other trustees, in the room of these appointed under the act, in like manner as is practised in chancery, in cases of trustees appointed therein. By the last section of the act, the trustees are said to be liable in all respects to the power and authority of the Court of Chancery, concerning the trusts created by the act.
 

 It will be conceded by all, that the Court of Chancery, without this act, had not the power, under its inherent or original jurisdiction, to change the trustees summarily upon petition, or except by means of a bill filed by and against all proper parties, for such causes as trustees may be removed in chancery.
 

 The second, third, fourth, fifth, and sixth sections of the act, except the last clause in the sixth already cited, prescribe minutely what may be done by the trustees who'might be appointed by the Chancellor, in relation to the land devised, leaving nothing to be done by the court, except in its supervisory'power over the acts of the trustees.
 

 Under this act, it does not appear that any application was made for'the substitution of trustees in place of those named in the will. The latter continued in their testamentary relation to the land devised, until after the act of March, 1815, had been passed.
 

 That act was passed upon the petition of Thomas B. Clarke. He recites a release to him by Clement'C. Moore of his contin
 
 *534
 
 gent interest in the estate devised, whereby he says himself and his infant children have become the only persons interested in the estate. And he declares that he has not been able to prevail upon any suitable person to undertake the performance of the duties’enjoined by the. first act. He then prays for an amendment of it.
 

 Leave was given in the Sénate' of New York, that, such a bill might be reported, and it was passed into an act the 24th of March, 1815.
 

 In the preamble to this act, after reciting Clement C. Moore’s release, “whereby the said real estate became exclusively vested in Thomas B. Clarke and his children,” it is enacted, that all the beneficial interest and estate of Moore, or those under him, arising by virtue'of the act, to which this is a supplement ; is vested in Clarke, his heirs and assigns, &c. And that so much of the act as requires the several duties therein enumerated to be performed by trustees, to be appointed by the Court of Chancery, as therein mentioned, be, and. the same is hereby, repealed.
 

 The power given by the first act to the court, to appoint trustees, having been repealed, the second section of the second act is, — that Clarke is authorized and empowered to execute and perform every matter and thing, in relation to the real estate mentioned in the act to which this is a supplement, in like manner, and with like effect, that-trustees; duly appointed under the first act .might- have done. . And * Clarke is required to apply the whole interest, and income of the property to the maintenance of his family and the education of his children. Then it is enacted, in the third section, that no sale, of any part of the estate shall be made by Clarke, until he shall have procured the assent of the Chancellor to such sale; who shall, at the time of giving such assent, also direct the mode in which the proceeds of such sale, or so much thereof as he shall think proper, shall be vested in Clarke as trustee; and further, that it shall be the duty of Clarke to render an annual account to the Chancellor, or to such person as he may appoint, of the principal of the proceeds of such sale only, the interest being to be applied by said Clarke in such manner as he may think proper, for his own use and benefit, and for the maintenance and education of his children. And if on such return, or at any other time, and in any other manner, the Chancellor shall be of the opinion, that Thomas B. Clarke hath not duly performed the trust by this act reposed in him, he may remove him and appoint another trustee in his stead, subject to such rules as he may prescribe in the management of the estate hereby vested in Thomas B. Clarke as trustee.
 

 
 *535
 
 We have hitherto used the words of the acts. And shall do so, as occasion may require, that Clarke’s character under the acts as a trustee, with power as it might be given to him by the Chancellor to sell, may not be misunderstood; and that the special powbr or jurisdiction given to the Chancellor in the whole matter may be more apparent, when we treat of that part of .the case.
 

 The orders given by the Chancellor under the first and supplemental act, upon the petition of Clarke, shall have our attention, after the third act which was passed for Clarke’s relief has been noticed.
 

 It was passed upon the memorial of Clarke. It recites, that the Chancellor, under the act for his relief, did order that he might sell the eastern moiety of the property in the act mentioned, but that, owing to the scarcity of money and low price, no sale could be made, without a great sacrifice. And therefore he prays to be permitted to mortgage the property, as the Chancellor may appoint, for the purposes mentioned in the preceding acts and order of the Chancellor.
 

 The act passed upon this petition is, that he is authorized, under the order heretofore given, or under any order which the Chancellor might give, to mortgage and sell the premises, as trustee under the will of Mary Clarke, and to apply the money to be raised by mortgage or sale to the purposes required or to be required by the Chancellor, under the acts heretofore passed for Clarke’s relief.
 

 So much of Clarke’s petition to the Legislature has been cited in connection with its acts, to show that the latter were coincident with, and not beyond, the relief for which he asked.
 

 Both fix conclusively that Clarke is to be regarded as the trustee only of the property devised, to sell or mortgage a part of it, with the assent or appointment of the Chancellor. His obligation is to account annually for the principal of the proceeds of every sale or mortgage which might be made, and it is his right to use the interest of the principal for himself and for the education and maintenance of his children. He is called trustee in thg acts. In that character, and in no other, is he recognized in the orders of the Chancellor. And, in the last clause of the third section of the second act, it is said another may be appointed in his stead,
 
 “
 
 subject to such rules as the Chancellor may prescribe, in the management of the estate, hereby vested in the said Thomas B. Clarke as trustee.”
 

 His relation to the devised estate was changed by the discharge of the trustees named in the will, but his interest in it was the same as it had been, with the exception of Moore’s as
 
 *536
 
 signment of his contingent remainder, and the power given to the Chancellor to assent to the sale or mortgage of a part of it. The acts
 
 of
 
 the Legislature discharged the trustees named in the devise, whatever may have been their estate in the land under it, but did not vest an estate in fee in Thomas B. Clarke.
 

 We will now precede our inquiry into .the jurisdiction given to 'the Chancellor by the acts, with a few remarks, which will add in determining the extent of that jurisdiction, and what would have been its rightful exercise.
 

 Jurisdiction in chancery is inherent and original, comprehending now almost every exigency of human disagreement, for which there is not an adequate remedy at law.'
 

 Or it is statutory, meaning a new power from legislation for the court to act upon particular subjects of a like kind, as occasions for doing so may occur. Examples of this statutory jurisdiction are the 43d of Elizabeth, called the Statute of Charities. The act known as .Sir Samuel Romilly’s, giving a summary remedy in cases of breach of trust for charitable uses. And' another is the trustee act of Sir Edward Sugden, for amending the laws respecting conveyances and transfers of estate and funds vested in trustees and mortgagees, and for enabling the courts of equity to give effect to their decrees and orders in certain cases.
 

 Or, the jurisdiction in equity is extraordinary, as when a statute permits persons to present petitions to the. Chancellor for relief in private affairs, when the petitioner cannot, get relief by the ordinary course of law, or from the inherent power .of a court of chancery. Cruise, in his Title 33, c. 11, says, they are termed real estate acts, and that it is a conveyance or settlement of lands or hereditaments, made under the immediate sanction of Parliament, in cases where the parties are not capable .of substantiating their agreements without the aid of the legislature, and where'the carrying such agreements into effect is evidently beneficial to the parties.
 

 . In these cases, it must also be recollected that the Chancellor acts- summarily,
 
 ex
 
 parte, 'upon the petition of the party seeking relief. Upon such petitions orders are given, as contradistinguished from decrees-in suits by bill filed. The last are his judgments upon the matters in controversy between the parties before the. court; the other being orders .in conformity with whatever may be the legislative direction and intent in any particular case. Whatever, however, the Chancellor does in either-case, he does as a court of' chancery. ' It will’ stand as his judgment, when it has been done within the jurisdiction conferred, until it has been set aside upon motion; as his
 
 *537
 
 decrees do, until they have been set aside by a bill of review.
 

 The acts for the relief of Thomas B. Clarke are of the last kind. They are private acts, relating to a particular estate and persons having interests in it; — one of whom, Clarke, is empowered, "as a trustee, to sell a part of it, with the consent of the Chancellor. Several cases of private acts for such relief as was asked by Clarke will be found m the 33 c. of Cruise.
 

 The acts in this case provide that the Chancellor may act upon them summarily, upon the application or'petition of Clarke, and in each of them what the Chancellor can do is precisely stated. In such cases, the court will not deviate from the letter of the act, nor make an order partly founded upon its original jurisdiction, and partly upon the statute. In other words, it cannot confound its original jurisdiction in a suit with the powers it may be authorized to execute by petition, either in a public act, giving statutory jurisdiction to the court, to be exercised summarily upon petition, or in a private act providing for relief in a particular - case, which is to be carried out by the same mode of procedure.
 

 The Legislature of New York, in the exercise of its rightful power to loose a devised estate from fetters put upon it by unforeseen causes, which were defeating the objects, of the testatrix, substitutes the Court of Chancery for itself, to give relief to Clarke, to the extent that it is enacted, according to the manner of proceedings in such cases in courts of chancery. The rélief, wanted by Clarke was permission to sell or mortgage a part of the estate. Permission to do either, or both, is given by the acts, provided it is done with the assent of the Chancellor.
 

 For the jurisdiction or power of the Chancellor in-the matter, we must look to the third section of the act of the 24th March, 1815, and to the act of March 29th, 1816. Both shall be cited in terms. The first is, that no sale of any part of the said estate shall be made by Thomas B. Clarke, until he shall have procured the assent of the Chancellor of this State to such sale; ai the time of giving such assent, the Chancellor shall also direct the mode in which the proceeds mf such sale, or so much thereof as he shall think proper, shall be vested in Thomas B. Clarke as trustee. And further, it shall be the duty of the said Thomas B. Clarke annually to render an account to the Chancellor, or to such person as he may appoint, of the principal of the proceeds of such sale only, the interest being to be applied by Clarke, in such manner as he may think proper for his use and benefit, and for the maintenance and education of his chil
 
 *538
 
 dren. The act of 1816 is, that Clarke “is authorized, under the order heretofore granted by the Chancellor, or under any subsequent order, either to sell or mortgage the premises, which the Chancellor has permitted or hereafter may permit him to sell, as trustee under the will of Mary Clarke, and to apply the money, so raised by mortgage or sale, to the purposes required, or to be required, by the Chancellor, under the acts heretofore passed, for the relief of the said Thomas B. Clarke.”
 

 Such is the jurisdiction of the Chancellor under these acts, in respect to sale, mortgage of the estate, and the proceeds which might be made from either. No authority is given to convey any part or parts of the southern moiety of the said estate in payment and satisfaction of any debt or debts due and owing by Clarke, upon a valuation to be agreed upon'between him and hjs respective creditors. None, that he might receive and take the moneys, arising from the premises, and apply the same to the payment of his debts, investing the surplus only in such manner as he may deem proper to yield an income for the maintenance and support of his family.
 

 This was not an exercise, of jurisdiction, but an order out of and beyond it. The jurisdiction given by these acts to the Chancellor is suggested by Blackstone, when he says, “A private act of Parliament for the alienation of an estate is an assurance by matter of record, not depending upon the act or consent of parties themselves. But the sanction of a court of record is called in', to substantiate, preserve., and be a perpetual testimony of the transfer of property from one man to another.” 2 Wend. Black. 344.
 

 It is not unworthy of remark, that the acts of New York now , under consideration were initiated and passed in strict conformity with the mode of legislative proceedings in passing private acts. There were petitions, references to committees, and leave to bring in bills. Nothing was done without the consent of the parties in being capable of consent; and the acts provide for an. equivalent in money to be settled upon the infants interested, who had not a capacity to act for themselves, but Avho were to be concluded by what was directed to be done under the acts. 2 Wend. Black. 345.
 

 r In all this may be seen, too manifestly for any denial of it, the intention of the Legislature as to the office of the Chancellor, in the execution of its acts for the relief of Clarke. The Chancellor’s office, in respect to the sale of the premises, was to substantiate and preserve a perpetual. testimony of the transfer of the property, as a matter of record, to whoever might be the purchaser of any part of it, in conformity with the way in which, a sale of it could be made.
 

 
 *539
 
 The beginning and the end of this affair are not unworthy of remark, or of being remembered. The Legislature is first asked to empower the Court of Chancery to' appoint trustees, in the place of those named in the will of Mary Clarke, to carry out her beneficent intentions for her grandson and his children. The father, being unable to. support himself and his children, asks that a sale might be made of a part of the devised premises, the rents, issues, and profits of which he was entitled to during life. An act is passed, permitting the appointment of trustees, giving a power to sell, and securing to the children an amount from the sales, thought by the Legislature to be only an adequate compensation for the sale of land in which they then had a vested estate in remainder, which would become theirs in fee simple absolute upon the death of their father. The next year, the Legislature is told that a trustee could not be got. A supplemental act is passed, permitting Clarke himself to do all that trustees could do. Then follows another memorial for another aiding act; to permit Clarke to mortgage the premises, on account of sales not having been made, and because they could not be made for a fair price. Permission is given.. After other orders more numerous than the acts under which they'were made, an order is given, permitting Clarke, upon an agreed valuation between himself and his creditors, subject to the approval of_a master in chancery, to convey the premises to his- creditors. Further, that he may apply the money arising from- the sales in payment of his debts, and invest the surplus in such manner as he may deem proper, to yield' an income for the support of his family. Thus importunity, beginning with an intention to obtain consummate control over a part of the devised premises, triumphs in the privilege given to the children to have any surplus invested for their use, which may remain out of the sales of their estate, after the payment of their father’s debts.
 

 The best commentary upon the whole is, that - its first result was a conveyance from Clarke to De Grasse, for much of the property, without the master’s approval, for worthless wild tax-lands in Pennsylvania or Yirginia, for some money lent, and for articles furnished Clarke from De Grasse’s oyster-house. And De Grasse held on to the conveyance, in defiance of the declaration of the master, that he would not approve the deed for such a consideration.
 

 It is under that conveyance, and another from De Grasse to him, that the present defendant in ejectment claims title to the premises in dispute. They do not give to him any title; either legal or equitable, against the fee simple absolute which the
 
 *540
 
 children of Thomas B. Clarke have had in the devised estate Since the death of their father.
 

 Whenever the order of the Chancellor, permitting Clarke to convey the estate to .creditors or to apply the money arising from it in payment of his debts, has been considered in the courts of New York, it has been intimated that the act did not give the Chancellor the power to give such an order. Judge Bronson, in Clarke
 
 v.
 
 Van Surlay, 15 Wend. 445, says so. The same, may be gathered from the opinion of Chancellor Walworth, in Cochran
 
 v.
 
 Van Surlay, 20 Wend. 384. Mr. Senator Yerplanck, in the same case, sitting in the Court for the Correction of Errors, says, — “I have already intimated my strong impression, at least as at present advised, that the orders of the Chancellor were pot in conformity with the acts, and that the third act still confined the Chancellor to allow no other application of the proceeds of the sale than was valid under the acts- heretofore passed.” “ The order made under the first two acts was in contravention of the statute so far as it allowed a part of the proceeds of the sale to be applied to the payment of Clarke’s former debts. Nor do I think that the words in the act of 1816 ratified the former orders, or extended the Chancellor’s powers in future orders, as to the liberty of applying the principal of the funds, of which, according to the acts heretofore on this subject, the interest only was to be expended.” In this point, then, this court, in the opinion it now expresses, will not differ from the courts in New York.
 

 But we do differ with the learned judges and Senator upon another point, common to the case before us and those cases in which they expressed their opinions. Our conclusion, however, contrary to. theirs, will be put upon grounds, not suggested when they acted on those cases. Indeed, our point of difference is not concerning a principle or rule in chancery; but as to the application of the rule in Cochran
 
 v.
 
 Van Surlay. It was said in that case, and it was the foundation of the judgment in it, that a decree in chancery could not be looked into in a collateral way for the purpose of setting aside rights growing out of it. We concur, that neither orders nor decrees in chancery can be reviewed as a whole in a collateral way. But it is an equally well settled rule in jurisprudence, that the jurisdiction of any court exercising authority over a subject may be inquired into in every other court, when the proceedings in the former are relied upon, and brought before the latter, by a party claiming the benefit of such proceedings; The rule prevails, whether the decree or judgment has been given in a court of' admiralty, chancery, ecclesiastical court, or court of common
 
 *541
 
 law, or whether the point ruled has arisen under the laws of nations, the practice in chancery, or the municipal laws of states.
 

 This court applied it as early as the year 1794, in the case of Glass et al.
 
 v.
 
 Sloop Betsey, 3 Dall. 7. Again, in 1808, in the case of Rose
 
 v.
 
 Himely, 4 Cranch, 241. Afterwards, in 1828, in Elliott
 
 v.
 
 Piersol, a case of ejectment, 1 Peters, 328, 340. This is the language of the court in that case, — not stronger though, than it was in the preceding cases: — “It is argued that 'the Circuit Court of the United States had no authority to question the jurisdiction of the county court of Wood-ford County, and that its proceeding's were conclusive upon the matter, whether érroneous or not. We agree, if the county court had jurisdiction, its decision would be conclusive. But we cannot yield assent to the proposition, that the jurisdiction of the county court could not be questioned, when its proceedings were brought collaterally before the Circuit Court. Where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. But if it act without authority, its judgments and orders are nullities;. they are not voidable, but simply void, and form no bar to a recovery sought,' even prior to a reversal, in opposition to them; they constitute no justification, and all persons concerned in executing such judgments, or sentenees,_are considered in law as trespassers.”
 

 This distinction runs through all the cases on the subject.
 

 This court announce the same principle in Wilcox
 
 v.
 
 Jackson, 13 Peters, 499, and twice since in the second and third volumes of Howard’s Supreme Court Reports. Shriver’s Lessee
 
 v.
 
 Lynn et al., 2 How.
 
 59;
 
 Lessee of Hickey
 
 v.
 
 Stewart et al., 3 How. 750.
 

 In the case in'3 Howard, the defendant in ejectment wished to protect himself by a record in a prior'chancery suit between himself and the plaintiff, in which a decree had been made in-favor of the former, upon which the chancery court had issued' a
 
 habere facies possessionem,
 
 to put him in possession of the land. The record in the Circuit Court was admitted as evidence, the plaintiff objecting, and the court gave judgment for the defendant in ejectment. The case was brought here upon a writ of error. And this court said, that, as the defendant claimed property on the premises in dispute under the record from the Court of Chancery, it would inquire collaterally into the jurisdiction of that court to try the question of title. And it ruled that the court had no jurisdiction for such a pur
 
 *542
 
 pose ; that the' Circuit Court erred in permitting the record to be read to the jury as evidence in behalf of the defendant, and reversed the judgment.
 

 The point in Cochran
 
 v.
 
 Van Surlay and in this case is, whether the Chancellor did or did not, in a case for which he had jurisdiction for certain purposes, exceed the jurisdiction given to him for the special purposes of the case. Jurisdiction may be in the court over the cause, but there may be an excess of jurisdiction asserted in its judgment. That was Shriver’s case, in 2 Howard.
 

 Then the point of inquiry now is, exactly that which the judges in the cases in 15 and 20 Wendell, admitted to be a very doubtful exercise of power by the Chancellor. That is, whether the order permitting Clarke to convey the property to his creditors, at a' valuation to be agreed upon between- them, and to apply the proceeds of sales and mortgages to the payment of his debts-, was an order within the power given to him by the acts. Judge Bronson will not admit it. Chancellor Walworth puts it hypothetically, — if the Chancellor has not exceeded his jurisdiction, but has merely erred upon the question whether such a sale as he ordered would eventually be for the benefit of the infants, Justice Bronson' was clearly right in supposing that the decision of the Court of Chancery could not be reviewed in thi.s collateral way. Mr. Senator Ver» planck says that the order under the first two acts was in contravention of the statutes, nor does he think that the act of 1816 extended the Chancellor’s power as to the proceeds.
 

 Upon the point of looking into the jurisdiction of a court collaterally, when a right'of,property is claimed under its proceedings, we must add, that it prevails in New York just as it does in the courts of England and in the courts of the United States. In Latham
 
 v.
 
 Edgerton, 9 Cowen, 227, it is said, — “ The principle that a' record cannot be impeached by pleading is not applicable when there is a want of jurisdiction. The want of it makes a record utterly void and unavailable for any purpose.'- The want of jurisdiction is.a matter that may always be set up against a judgment when it is to be enforced, or when any benefit is claimed under it.” See also, to the samé point, Fenton
 
 v.
 
 Garlick, 8 Johns. 194; Kilbourne
 
 v.
 
 Woodworth, 5 Johns. 37; 19 Johns. 39; 6 Wend. 446. And in the case, of Rogers
 
 v.
 
 Diel, 6 Hill, 415, — a case of ejectment, — the chief justice ruled that the power of a court of chancery to order the real estate of an. infant is derived entirely from the statute.- ' Thus sustaining an objection collaterally to proceedings and a decree in chancery which' were regular in
 
 *543
 
 form, but void in fact, on account of the Chancellor’s not having jurisdiction or authority to make such a decree.
 

 The operation of every judgment depends upon the jurisdiction of the court to render it. Though there may be jurisdiction for certain purposes in a cause, that jurisdiction may be exceeded in the judgment. And whenever the right to property is claimed to have been changed under a judgment or decree by a court, and it is set up as a defence in another court, the jurisdiction of the former may be inquired into. The rule is, that where a limited tribunal takes upon itself to exercise a jurisdiction which does not belong to it, its decision amounts to nothing, and does not create a necessity for an appeal. Attorney-General
 
 v.
 
 Lord Hotham, Turn. & Russ. 219.
 

 And such is the rule in New York, as has been shown by the citation of cases from the reports of that State. But it has been argued, that the rule will not apply in the cases now in hand, because it has been decided by the highest tribunal. in New York, that the Chancellor had jurisdiction, under the acts for the relief of Clarke, to give the order permitting him to sell the property to his .creditors in payment of his debts.
 

 It is difficult for us to admit that the cases of Clarke
 
 v.
 
 Van Surlay, in 15 Wendell, and Cochran
 
 v.
 
 Van Surlay, in 20 Wendell, were meant to decide that point, when each judge whose opinion has been reported in those cases expresses an opinion amounting almost to a denial that the Chancellor had jurisdicr tion to order or permit a sale in payment of Clarke’s debts. But admit that the New York cases are otherwise, we cannot admit that the rule hitherto observed in the court-, of recognizing the judicial decisions of the highest courts of the States upon State statutes relative to real property as a part of local law, comprehends private statutes or statutes giving special jurisdiction to a State court for the alienation of private estates. It has never been extended to private acts relating to particular persons, for the reason, that, whatever a court in a State may do in such a case, its decision is no part of local law. It concerns only those for whose benefit such a law was passed, and because the decision under it is no rule for any other future case. It may from analogy be cited for the interpretation of another private law of a like kind, but then the utmost extension of it would be, that there would be two judgments in two private cases, which only show more plainly that no local law had been made by both.
 

 The case put before us, upon several of the points certified, is this. The State of New York passes certain acts for the relief of Thomas B. Clarke, in relation to a devise of land, and
 
 *544
 
 directs that the acts shall be carried into execution by the Chancellor of the State. In the course of the proceedings for that purpose,, he orders that the trustee, Clarke, may sell or mortgage particular portions of the land, and permits him to convey parts o'f it in payment of any debt or debts, upon a valuation to be agreed on between himself and his creditors; and that Clarke may apply the proceeds of sales to the payment of his debts.
 

 The defendant in this action says he bought from De Grasse. It is proved that De Grasse was a creditor of Clarke, and that the consideration for Clarke’s conveyance to him, except the wild lands, was the amount that Clarke owed to him. Then, in order to sustain Clarke’s conveyance to De Grasse, he introduces the acts for the relief of Clarke, and the orders of the Chancellor upon them.
 

 This evidence raises the question, whether or not the Chancellor had jurisdiction to give an order, permitting Clarke to convey any part of the property in payment of a debt. After the most careful, perusal of the acts and orders, we have concluded that the Chancellor had not the jurisdiction to give an order, permitting Clarke to convey any part of the devised premises in satisfaction of his debts, and' that neither De Grasse nor his alienee, Berry, can derive from the order, or the conveyance by Clarke to De Grasse, any title to the premises in dispute. This conclusion substantially answers the first four points certified; but answers will be given in more precise form hereafter.
 

 We now proceed to the other points certified.
 

 Upon the first of them, relating to the premises having been parted with by Clarke to De Grasse, upon a consideration other than cash, we remark, that
 
 sale
 
 is a word of precise legal import, both at law and in equity. It means at all times, a contract between parties, to give and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold. Noy’s Max., ch.
 
 42; Shep.
 
 Touch. 244. No departure from the manner in which a sale is directed to be made, either under a judgment at law or a decree in equity, is permitted.
 

 In the acts for the relief of Clarke,
 
 sale
 
 is the word used and frequently repeated. No other term, in reference to the power given to sell a part of the devised premises, is used. The Chancellor’s' order is, that Clarke is permitted to sell. No words are used in the acts to qualify the term
 
 sale.
 
 There is not any thing to raise a presumption, that Clarke was permitted to sell for any thing else than cash. Even the deb.ts of Clarke,
 
 *545
 
 which the Chancellor thought he-had the jurisdiction to order the payment of, are directed to be paid out of the proceeds of the sale.
 

 We think, therefore, that the deed executed by Clarke to De Grasse, being upon a consideration other than for cash, is not valid to pass the .premises in dispute to De Grasse, or to his alienees.
 

 Another point certified is, whether Clarke, having previously mortgaged the premises in fee to Henry Simmons, had competent authority to sell and convey the same to De Grasse. ■ If Clarke could not convey the premises for which he was the trustee to a creditor in payment of a debt due when the order of the Chancellor was given, his having united with the master in chancery in mortgaging the premises in fee to Simmons, as a security for a debt, could not, from any transfer of it by the mortgagee, alter- its character as a security for a debt,' so as to permit the assignee, who by taking an assignment of the mortgage became a creditor, or any other person who became his assignee, to receive from Clarke a conveyance of the premises in discharge of the mortgage. Simmons was a creditor . of Clarke. The assignee of his claim could only be a creditor in his place, having no other right to be paid by a conveyance of the premises, than the original creditor had. But in truth the mortgage was discharged, and being so, Clarke was replaced in his trustee relation to the premises, precisely as he stood before the mortgage was made. He could not then,''because the land had been mortgaged in fee to Simmons, have any authority to sell and convey the premises to De Grasse, for the consideration of the debt due by him to De Grasse. But if by the question it was meant that, because Clarke had mortgaged to Simmons, he could not mortgage or sell again after a release from the mortgagee, then we conclude that Clarke’s having previously mortgaged - the premises in fee to Simmons, did not prevent him, after a release from the mortgagee, from selling and mortgaging the premises again, provided the same was not done in payment of a debt, or as security for a debt.
 

 The eighth point may be dismissed with two observations. If the conveyance from Clarke to De Grasse did not give to him a title, and we have said it did not, De Grasse could not convey a title in the premises to a third person, though value was received by him from the'latter. Besides, in this case, the paper under which De Grasse claims has recitals in it, which would exclude any- person buying from him from saying that he had not notice enough to put him upon an inquiry into the title of De Grasse.
 

 
 *546
 
 We are now brought to the consideration of the point, whethr er the deed to De Grasse is valid, it having no certificate indorsed upon it that it was approved by a master in chancery. It involves what has been the practice in courts of equity, which, frqm long standing, habitual use, and uniform judicial acquiescence, has become law, — law in England, law in New New York, law for the courts of equity -of the United States, and law in every State of the Union, except as it may have been modified by the legislation of the States.
 

 The usual mode of selling property under a decree or order in chancery is a direction that it shall be sold with the approbation of a master in chancery, to whom the execution of the decree in that particular has been confided. It matters not whether the sale is public or private by a person authorized to make it. Not that the approbation of the master in either case completes a title to a purchaser. It is only the master’s approval of the sale, and is one step towards a purchaser’s getting a title. Before, however, a purchaser can get a title, he must get a report from the master that he approves the sale, or that he was the best bidder, accordingly as the sale may have been made either privately or at auction. That report then becomes the basis of a motion to the court, by the purchaser, that his purchase may be confirmed. Notice of' the motion is given to the solicitors in the cause, and confirmation
 
 nisi
 
 is ordered by the court, — to become absolute in a time stated, unless cause is shown against it. Then, unless the purchaser calls for an investigation of the title by the master, it is the master’s privilege and duty to draw the title for the purchaser, reciting in it the decree for sale, his approval of it, and the confirmation by the court of ‘ the sale/in the manner that such confirmation has been ordered.
 

 We have been thus particular, for the purpose of showing the offices of the master in relation to a sale, and what is meant by subjecting a sale to the approval of a master, and to snow that such a sale, until approved by the master and confirmed •by the court,- gives no title to a purchaser of an estate, which he may have bargained to buy. We do not mean to say, that such cautionary proceedings upon sales under decrees and orders in chancery may not be dispensed with, by a special order of the Chancellor to pretermit them: but that such are the proceedings, when no special -order has been given. Nor do we mean to have it implied that a special order for the master’s approval of the sale was not given in this case.
 

 The proviso in the order of the 15th March, 1817, is, — “ Provided, nevertheless, that every sale, and mortgage, and convey
 
 *547
 
 anee in satisfaction, that may be made by the said Thomas B. Clarke in virtue hereof, shall be approved by one of the masters of this court, and that a certificate of such approval be indorsed upon every deed or mortgage which shall be made in the premises.”
 

 Our interpretation of the order is, that the approval of the master, and the certificate of it, are not confined to a conveyance in satisfaction of debt, but that the Chancellor meant that the approval and certificate should be given and be indorsed upon every deed of sale and mortgage, as well as upon conveyances in satisfaction of debt's.
 

 It was also argued, that the sale to De Grasse was a judicial sale. Unless a legal term of definite and unmistakable certainty in all the past application of it shall be made to comprehend a transaction which it has never included before, the sale by Clarke to De Grasse was not a judicial sale. By judicial sale is meant one made under the process of a court haying competent authority to order it, by an officer legally appointed and commissioned to sell.
 

 The sale by Clarke to De Grasse was an attempt by both of them to evade the order of the Chancellor, that every sale„&c., made by Clarke, shall be approved by one of the masters of this court, and that a certificate of such approval be indorsed upon every deed or mortgage that may be made in the premises. And in no event could a sale by Clarke, in conformity with the order, have been a judicial sale, but simply a sale by a private individual authorized to make it under acts passed for his relief, and assented to by the Chancellor, for the purpose of ultimately substantiating and verifying by a court of record the transfer of the property. It was a sale - made without process, not by an officer in any sense"of the word, but by a private person to a private person, after negotiation between them, and done by one of them, who had only in a particular way the assent of the Chancellor to sell.
 

 Now if, in the instance of Clarke’s conveyance to De Grasse, none of the usual cautions have been taken by the latter to make the conveyance complete, — which, for the sake of the present point, we are only supposing might have been done, subject to our conclusion that Clarke could not have conveyed the premises to him as a creditor, — whose fault is it that they were not taken ? and how much more is De Grasse’s fault aggravated from the testimony in the cause, which proves that he was told by the master, Mr. Hamilton, from the start of his buying or meaning, to buy from Clarke, that he would not- approve the sale, and make such a certificate of it, upon the paper
 
 *548
 
 given to-him by Clarke, upon such a consideration for the property ?
 

 We find the answer to our inquiries in the long experience and practice in chancery. In any sale under a decree or order in chancery, the purchaser, before he pays his money, must not only satisfy himself that the title to the property to be sold is good, but he must' take care that the sale has been made according to the decree or order. Colclough
 
 v.
 
 Sterum, 3 Bligh, 181; Lutwiche
 
 v.
 
 Winford, 2 Bro. C. C. 251. If he takes a title under an imperfect sale, he must abide the consequence.
 

 In this instance, there was a perverse disregard by De Grasse of the order of the Chancellor and the caution of the master. His conduct puts it out of his power, or any one claiming under him, to complain, .if Clarke’s conveyance shall be declared to be invalid, on account of the master’s disapproval of the sale and his refusal to put a .certificate of approval of it upon the deed to De Grasse.
 

 Mr. Hamilton the master’s testimony in the case is,-that Clarke and De Grasse came to him to approve the deed which' it is his impression had been filled up by Clarke, and -that, upon ascertaining from them the consideration,'he refused to do so. The deed, too, recites-a consideration of two thousand dollars, and it is proved that-the consideration was, in fact, wild worthless tax-lands in Virginia or Pennsylvania, an account for articles furnished 'to Clarke by De Grasse, and some items of money lent. The witness says, both Clarke and De Grasse came together more than once to his office on the subject, and that he was besought by them frequently to approve the deed; that he would not do so. , It is the case of an anxious creditor, holding on to what he could get from an insolvent and prodigal debtor, in spite of what he knew to be the only terms upon which the debtor could convey.
 

 ■ We think that the sale by Clarke was a nullity without such approval by the master, to whom the execution of the order was confided by the Chancellor.
 
 “
 
 Looking merely to the parties, it is a nullity, because it wants 'the assent of the Chancellor, through the officer whom he substitutes for himself - to give it-. Looking to the conveyance, it is void for the want of the performance of that condition precedent which was made essential, not merely to' the commencement of the estate, but to the very creation of the power of sale.”
 

 It is under that conveyance, and another from De Grasse to him, that the defendant in ejectment claims title to the premises in. dispute.; They do not give to him any title, either legal or equitable.
 

 
 *549
 
 We answer, then, to the points certified to-this court for its decision: — ,
 

 To the first point, we rule, that the act of the Legislature, stated in the case, divested the estate of the trustees under the devise in the will of Mary Clarke, but did not vest the whole estate in fee, or any 'part of it, in Thomas B. Clarke.
 

 To the second point, we rule, th$i the authority given by the said acts to the trustee to sell, was a special power, to be strictly pursued, and that the trustee was not vested with an absolute power of alienation, but only with the power to sell with the assent of the Chancellor, subject, in all that the trustee might do, by way of sale or otherwise, concerning the premises, to reexamination and account in equity.
 

 To the third point, we rule, that so .much of the order set forth in the case, as having been made by the Chancellor, which permitted Thomas B. Clarke to convey any part or parts of the southern moiety of .the estate, or any other part of the estate, in payment and satisfaction of any debt or debts due and owing from Thomas B. Clarke, upon a valuation to be agreed between himself and his respective creditors, provided, nevertheless, that every sale, and mortgage, and conveyance in satisfaction, that may be made by the said Thomas B. Clarke, in virtue hereof, shall be approved by one of the masters of the court, and that a certificate of such approval be indorsed upon every deed or mortgage that may be made in the gyemises, or which authorized Thomas B. Clarke to receive and take the moneys arising from the premises and apply the same tó the payment of his debts, and to invest the surplus in such manner as he. may deem proper to yield an income for the maintenance and support of his family, — was not authorized or in conformity to the acts of the Legislature, as they are set forth in the record. That these orders, however, are tó be regarded as the acts of a court of chancery, exercising a special jurisdiction under private acts, which did not give to the Chancellor jurisdiction to pass the orders as they have been stated in this answer to the third point.
 

 To the fourth point, we rule, that the Chancellor had authority under the acts to assent to sales and conveyances of the estate by the trustee ; but not to any sale or conveyance, on any other consideration than for cash paid on said conveyance.
 

 To the fifth point, we rule, that the deed executed by Thomas B. Clarke to George De Grasse, for the premises in question, is not valid, it having been made for a consideration other than for cash paid on the purchase.
 

 To the sixth point, we rule, that, if the deed to De Grasse
 
 *550
 
 had been otherwise valid, which we have said was not, it would not' be valid without having a certificate indorsed thereon, that it was approved by Mr. Hamilton, the master in chancery, to whom the execution of the order was confided by the Chancellor.
 

 To the ^seventh point, we rule, that the mortgage in fee of the premises by Clarke to Simmons, did not so exhaust the power as trustee, that he might not, after a release from the mortgagee, sell or mortgage the property again; but it was not in the trustee’s power to sell to De Grasse for a debt.
 

 To the eighth point, we rule, that the subsequent conveyance of the premises, as set forth in the case, made by George De Grasse, would not give to his grantee, or the grantee’s assigns, a valid title against the plaintiffs in ejectment.
 

 Mr. Chief Justice TANEY dissented from the opinion of the court in this case, and also in the subsequent cases of Williamson and Wife
 
 v.
 
 The Irish Presbyterian Congregation of New York, and of Charles A. Williamson and Wife, Rupert J. Cochran and Wife, and Bayard Clarke,
 
 v.
 
 George Ball; and concurred with Mr. Justice NELSON.
 

 Mr. Justice CATRON also dissented in the above' enumerated cases, and concurred with the opinion of Mr. Justice NELSON.
 

 Mr. Justice NELSON.
 

 I am unable to concur m the judgment of a .majority of the court in this case, and shall, therefore, proceed to state the grounds of that dissent, with as much brevity as the nature and importance of the questions involved will admit.
 

 I shall confine the examination to those grounds which I regard as decisive in the determination of these questions, without stopping to discuss several other points made upon the argument, and which have a more remote bearing upon the case.
 

 The will of Mary Clarke, made and published April 6th, 1802, lies at the foundation of this controversy; and it is necessary, therefore, to recur for a moment to its provisions.
 

 She devised to three trustees and their heirs, a part of her farm at Greenwich, called Chelsea, then situate in the vicinity of the city of New York, now a part of it, embracing some forty acres of land, together with a dwelling-house in town, in trust, to receive the rents and profits, and pay the same to Thomas B. Clarke, a grandson', during his life; and after his decease, to convey the estate to his children living at his death ; and ifTie should leave no children, then, in trust, to convey the same to Clement C. Moore, and his heirs.
 

 
 *551
 
 Thomas B. Clarke, the tenant for life, was married in 1802, and in 1814 had a family of six children, the eldest eleven years of.age; and on the 2d of March of that year, applied to the Legislature of New York for relief, on the ground that the property devised was, in its then condition, nearly unproductive, and incapable of being improved so as to yield an adequate income for the maintenance and support of himself and family.
 

 The trustees, and C. C. Moore joined in the application.
 

 On the 1st of April, 1814, an act was passed for his relief, authorizing the Court of Chancery to appoint trustees in the place of.those named in the will, and providing for a sale of a moiety of the estate by the trustees, under the direction of the Chancellor; the proceeds to be invested in stocks or real security, upon the trusts in the will, and the income to be applied to the maintenance and support of the family of Clarke, and the education of his children. Nothing was done under this act.
 

 On the 21st of February, 1815, Clement C. Moore, the ultimate remainder-man under the will, released and quitclaimed all his interest in the estate to Clarke; and on a second application to the Legislature for relief, a supplemental act was passed, on the 24th of March, 1815, reciting in the preamble the release, and substituting Clarke as the trustee of the estate in place of those provided for in the previous act; and authorizing a sale by the trustee of a moiety of the estate, with the assent of the Chancellor, and providing for the investment of so much of the proceeds- in Clarke, as trustee, as the Chancellor should direct; the income of the investment to be applied to the maintenancé and support of the family, as in the previous act.
 

 On an application to the Chancellor, under this and the previous act, on the 28th of June, 1815, an order of reference to one of the masters in chancery was made, directing him to inquire into the debts of Clarke, distinguishing between those contracted for the maintenance of his family and the education' of his children; and into the then condition of the estate devised under the will, and the means possessed by Clarke to maintain and support his family, other than from the rents and profits of the estate; which report was made accordingly. And on the coming in and filing of the same, the Chancellor, on the 3d of July, ordered a sale of a moiety of the estate, together with the house and lot in town; and that so much of the proceeds as., might be necessary for the purpose be applied, under the direction of one of the masters of the court, to the payment and discharge of the debts then owing by Clarke, and to be contracted for the necessary purposes of the family, to be proved before the said masters; and the residue to be invested and the income applied as therein provided by the order.
 

 
 *552
 
 Nothing was done under this order except the sale of a few lots, the sales having been superseded by the master for waqt of bidders, at the Request of the trustee, to prevent the sacrifice of the property. And on application to the Legislature, another act was passed, on the 29th of March, 1816, authorizing Clarke, as trustee, under the order already granted by the Chancellor, or any subsequent orders that might be granted, either to mortgage or sell the premises which the Chancellor had permitted, or might permit, him to sell; and to apply the proceeds to the purposes required, or that might be required, by the Chancellor, under the previous acts of the Legislature.
 

 On the 15th of March, 1816, on an application, the Chancellor ordered that Clarke be authorized to mortgage or sell the moiety of the estate, as provided for in the several acts, as might be deemed most beneficial to all parties concerned; and also to convey any part of it in payment and satisfaction of any debt owing by him, upon a valuation to be agreed on between him and his creditors, provided that every sale, and mortgage, and conveyance in satisfaction, that may be made by him, shall be approved by one of the masters of the court; and that the certificate of such approval be indorsed on such deed or mortgage that may be made in the premises. And further, that he apply the proceeds to the payment of his debts, and invest the surplus in such manner as he may deem proper to yield an income for the support and maintenance of his family.
 

 On the 2d of August,-1821, Clarke, under this order of the court, sold and conveyed the lot' in question, among’ others, to George De Grasse, for the consideration on the face of the deed of $ 2,000. No approval of the master appeared to have been indorsed on the deed.
 

 The defendant holds through intermediate conveyances from De Grasse, and is admitted to be a
 
 bona fide
 
 purchaser.
 

 I have thus stated the material facts out of which the important questions involved in this case arise; and I have done so for the reason, that, in my judgment, the statement itself presents a history of legislative and judicial proceedings, which demonstrate that the legal title to the premises in controversy is in the defendant, upon well established principles of law,— a title derived under a judicial sale, made in pursuance of an order or judgment of one of the highest courts in a State, in the exercise of its general jurisdiction.
 

 This plain proposition is manifest on the face of the record. Every order made by Chancellor Kent was made in his court according to the established forrná of proceeding, and rules of the court.
 

 
 *553
 
 The Chancellor had previously determined, (In the Matter of Bostwick, 4 Johns. Ch. 100,) that a proceeding of this character could be properly instituted by petition instead of by bill, as he found it to be in conformity with the established practice of the Court of Chancery in England.
 

 The practice there had not been uniform, depending somewhat upon the amount of the estate; and a distinction had been made, at one time, between real and personal estate; but the later authorities had generally concurred in allowing the institution of the proceeding by petition. (2 Story’s Eq. § 1354, p. 582, and cases there referred to; Macpherson on Infants, ch. 22, 1, and cases.)
 

 In every instance, the application took the usual course of a reference to one of the masters of the court, directing him to inquire into the truth of the allegations in the petition, and report thereon; and upon the coming in and filing of the report, the order was entered.
 

 All the powers and machinery of the court were used in conducting the proceedings : and which, while they facilitate the orderly despatch of business, at the same time enable the parties to present their case in the fullest and most authentic form, for the judgment of the court.
 

 Even if a bill had been filed in this case, —and we have seen that it might have been, in Which event, it would hardly have been pretended the order or decree of the court could have been questioned collaterally, — the forms of the proceeding could not have been more strictly observed. Indeed, the petition in the particular case is nothing more than a substitute for the bill, as affording a more speedy and economical mode of instituting-the proceedings.
 

 Originally it was supposed that a bill was indispensable, (Fonbl. Eq., Book 2, part 2, ch. 2, § 1, note
 
 d,)
 
 as it still is in England, where the estate of the infant is large, or it is doubtful as to the fund. (15 Ves. 445; Macpherson on Infants, p. 214, and cases.)
 

 Any party interested in the order had a right to appeal from the decision of the Chancellor to the Court for the Correction of Errors, -as appeals may be taken from interlocutory, as well as final decrees, according to the laws and practice in New-York.
 

 That an appeal might have been taken in the case is the established practice, and would be doubted by no lawyer there; and which, of itself, would seem to be decisive of the nature and character of the jurisdiction exercised by the Chancellor.
 

 Being, therefore, a judicial sale under the judgment of one of the highest courts of the State, the principle is fundamental,
 
 *554
 
 that the regularity of the proceedings cannot be inquired into in this collateral way.
 

 The general impression of all the cases on this head, says Lord Redesdale, is, that the purchaser has a right to presume that the court has taken the steps necessary to investigate the rights of the parties, and that it has on investigation properly decreed a sale (1 Sch. & Lef. 597). And says Mr. Justice Thompson, in delivering the opinion of this court, in Thompson
 
 v.
 
 Tolmie, 2 Peters, 168, —
 
 “
 
 If the purchaser was responsible for the mistakes of the court in point of fact, after it had adjudicated upon the facts, and acted upon them, these sales would be snares for honest men. The purchaser is not bound to look farther back than the order of the court. He is not to see whether the court was mistaken in the facts.”
 

 The defendant in that case held the title.under a judicial sale, ordered by the court in a case of partition, where the commissioners had reported that partition could not be made without loss. The suit was brought by the heirs, who set up, as invalidating the title of the defendant, that neither of the children of the intestate was of age at the time of the sale. The statute expressly forbade it, until the eldest became of age. The other ground was, that the sale' had been confirmed only conditionally. The court held the parties concluded by the order and sale.
 

 I shall not pursue the examination of this branch of the case farther, as the principle upon which it rests has become incorporated into the very elements of the law. I have referred to these two cases, simply to illustrate the strength and force of the principle, in protecting the title of a
 
 bona fide
 
 purchaser, standing in the relation of the present defendant.
 

 But it has been argued,that Chancellor Kent,while sitting in his court, administering the law under these acts of the Legislature of New York, has misconstrued or misapprehended the 'nature of his jurisdiction; and that, instead of sitting as a court, he was acting in the subordinate character of a commissioner, or as an individual outside of his court; that it was an extraordinary power, conferred upon him by a special statute, prescribing the course of proceeding: and that any departure therefrom, or error in the proceedings, rendered the order null and void, and of course all acts done under it.
 

 It was even intimated, though not argued, that the statutes themselves were unconstitutional; that it was not competent for the Legislature to authorize the sale of the real estate of infants for their maintenance and support, or for their education or advancement in life. ’
 

 
 *555
 
 We suppose this power will be found to exist in every civil-? ized government, that acknowledges a superintending and protecting power over those of its citizens or subjects who are disabled through infancy or infirmity from taking care of themselves ; and that, where they possess the means of themselves, they will be applied, under the direction of the proper authority, to their support and nourishment.
 

 No one doubts the power of the government to take the property of the citizen to support the paupers of the State; and, surely, it can hardly be regarded as a very great stretch t>f power to provide for the application of it to the maintenance and support of the ownei or proprietor himself, or even to the support of members of the sáme family.
 

 But I shall not go into this question; for whatever may be the objections to the exercise of the legislative powers, we are not aware of any on the ground of repugnancy to the Constitution of the United States, or, if made, that there is any foundation for it; and as to the State of New York, where the question alone must be determined, no doubt is entertained there in respect to it, by any department of the government.
 

 But to recur to the jurisdiction of the Chancellor.
 

 The Court of Chancery possesses an inherent jurisdiction, which extends to the care of the persons of infants so far as is necessary for their protection and education; and also to the care of their property, real and personal, for its due management, and preservation, and proper application for their maintenance.
 

 The court is the general guardian, and, on the institution of proceedings therein involving rights of person or property concerning them, they are regarded as wards of the court, and as under its special cognizance and protection;' and no act can be done affecting either person or property, or the condition of infants, except under the express or implied direction of the court itself; and every act done without such direction is treated as a violation of the authority of the court, and the offending party deemed guilty of a contempt, and treated accordingly.
 
 (2
 
 Story’s Eq. <§>§ 1341, 1352, 1353; 3 Johns. Ch. 49; 4 ib. 378; 2 ib. 542; 6 Paige, 391, 366; 10 Ves. 52; Macpherson on the Law of Infants, p. 103, App’x, 1; Hughes
 
 v.
 
 Science, 3 Atk. 601, S. C.)
 

 If the father is not able to maintain his children, the court will order maintenance out of their own estate; and the inability need .not depend upon insolvency, but inability, from limited means, to give the child an education suitable to the fortune possessed or expected. (Buckworth
 
 v.
 
 Buckworth, 1 Cox,
 
 *556
 
 80; Jervoise
 
 v.
 
 Silk, Coop. 52.) The allowance will be made, although the devise or settlement under which the property is held contains no direction for maintenance (Ibid.), but even directs the income to accumulate. (5 Ves. 194, 195, note, 197, note; 10 ib. 44; 4 Sim. 132; Macpherson, ch. 21, § 2, p. 223.)
 

 It is also settled, that where there are iegacies to a class of children, for whom it would be beneficial that maintenance should bé allowed, though the will does not authorize it, but directs an accumulation of the income, and the principal, with the accumulation, to be paid over at twenty-one, with survivor-ship in case any should die under age, the court will direct maintenance (11 Ves. 606; 12 ib. 204; 2 Swanst. 436); but if there is a gift over, it will not be allowed without the consent of the ultimate devisee. (14 Ves. 202; 5 ib. 195, note; Ward on Legacies, 303; Macpherson, pp. 232, 233, 234.)
 

 So the court will break in upon the principal, where the income is insufficient for maintenance and education (1 Jac. &. Walk. 253; 1 Russ & Mylne, 575, 499); and will break in upon it for past payments (2 Vern. 137; 2 P. Wms. 23); and where the father is unable to maintain his children, and has contracted debts for this purpose, or for their education, the court will direct a reimbursement out of the children’s estate (6 Ves. 424, 454; 1 Bro. C. C. 387; Macpherson, § 9, p. 246); and will, if the father or mother is in narrow circumstances, in fixing the allowance, have regard to them, increasing it for the benefit of the family. (1 Ves. 160; 2 Bro. C. C. 231; 1 Beav. 202; 1 Cox, 179.)
 

 The management and disposition of the estates of infants, which I have thus referred to, and briefly stated, with the authorities, are among the mass of powers upon this subject which belong to the original and inherent jurisdiction of the Court of Chancery. They relate to their personal, and the income of their real, estate, the court having no inherent power to direct a sale of the latter for their maintenance or education; that power rests, with the Legislature. It will be seen, therefore, that the only additional authority conferred upon the Chancellor, by the acts of the Legislature in question, was the power to direct the sale of the real estate, — ■ to convert it into personalty for the purposes mentioned. It was but an enlargement, in this respect, of the existing jurisdiction of the court; placing the real estate, for the purpose of maintenance and education, upon the same footing as the personalty. With this exception, every power conferred or exercised under the acts in question, in the management and application of the fund, as we have seen, belonged inherently to its general jurisdiction; and its exercise in the particular case was as essential for the proper management and
 
 *557
 
 preservation, and application, as in any other that plight come before the court.
 

 . We can hardly suppose that it was the intention of the Legislature to confer authority upon the Chancellor in one capacity •to sell, and in another to manage and apply the proceeds for the benefit of the children. And yet such must be the conclusion, unless we suppose it was intended that the fund itself should be administered out of court, and under the direction of the Chancellor as a commissioner.
 

 . I must be permitted, therefore, to think, that Chancellor Kent, familiar to his mind as were the powers and duties belonging to his court over the estates of infants, as well as in respect to every other branch of equity jurisprudence, did not mistake or misapprehend the nature of the powers and duties enjoined upon him under the acts in question. And that he might well conclude, that the .authority to sell the real estate of the children, for their maintenance and education, was but an.enlargement of his general jurisdiction in the management and disposition of their property for the purposes mentioned. Indeed, the very objects of the sale pointed directly to this jurisdiction. How apply the fund for maintenance and education,— as commissioner, or chancellor? Certainly, he could not doubt as to the intent or objects of the acts in this respect. It .was a fund to be brought into the court, and the children were to become Wards of the court, to be' cherished, and protected by its powers. '
 

 In addition to the judgment of Chancellor Kent himself, we have also the judgments of the two highest courts in New York, in the case of Clarke
 
 v.
 
 Van Surlay, 15 Wend. 436, and Cochran
 
 v.
 
 The Same, 20 Wend. 365, S. C.
 

 That was a suit involving the same title, brought by one of the heirs of Thomas B. Clarke, and depending upon the same evidence. It was first decided in the Supreme Court of that State in 1836, and in the Court for the Correction .of Error's in 1838. ' - •'.
 

 It was determined by both courts, that the title of the pur-, chaser was valid, on the ground, that he held under a judicial sale directed by the Chancellor in the exercise of his general jurisdiction ; and that, having jurisdiction of the subject-matters, if any error was committed, either in his construction of the acts of the Legislature or in the ■application of the funds, it was not inquirable into in a court of lav/. The order was conclusive, till set aside, upon all the parties.
 

 No member of either court that expressed-an opinion entertained a doubt about the nature of the jurisdiction. The judg
 
 *558
 
 ment had the concurrence of Chancellor Walworth, his learned successor, who has presided in that court with distinguished ability for the last twenty years, and is familiar with its organization and powers. If it is possible, therefore, for a judicial question involving the construction of State laws to be settled' by learning or authority in its own courts, it would seem that the one before us has been.
 

 But there is another view of this branch of the case, which, in my judgment, is equally decisive of the question ; and much more important, on account of the principle involved. Where are we to look, for the purpose of ascertaining the jurisdiction of the Court of Chancery of the State of New York ? To the judgment of this court, or to the laws and the decisions of the courts of the State ?
 

 It should be recollected, that, in the trial of titles to real property held or claimed under the laws of the State, the Federal courts sitting in the State are administering those laws, the same as the State courts, and can administer no other. They are obliged to adopt the local law, not only because the titles are founded upon it, but because these courts have no system of jurisprudence of their own to be administered, except where the title is affected by the Constitution of the United States, or by acts of Congress.
 

 It has been held, accordingly, that we are to look to the local laws for the rule of decision, as ascertained by the decisions of the State courts, whether these decisions are grounded on the construction of statutes, or form a part of the unwritten law of the State. The court adopts the State decisions, because they settle the law applicable to the case. Such a course is deemed indispensable in order to preserve uniformity ; otherwise, the peculiar constitution of the judicial tribunals of the States, and of the United States, would be productive of the greatest mischief and confusion,— a perpetual conflict of decision and of jurisdiction.
 

 ' In construing the statutes of a State on which land titles depend, say the court, infinite mischief would ensue should this court observe a different rule from that which has been established in the State ; and whether these rules of land titles grow out of the statutes of a State, or principles of the common law, adopted and applied to such titles, can make no difference ; as there is the same necessity and fitness in preserving uniformity of decisions in the one case as in the other. This court has repeatedly said, speaking of the construction of statutes, that it would be governed by the State construction where it is settled, and can be ascertained, especially
 
 *559
 
 where the title to lands is in question. (12 Wheat. 167, 168; 6 Peters, 291.) In the case of Nesmith et al.
 
 v.
 
 Sheldon et al., 7 Howard, 818, decided at the last term, involving a question .upon the statutes of Michigan, the court say, —
 
 “
 
 It is the established doctrine of this court, that it will adopt and follow the decisions of the State courts in the construction of their own constitution and statutes, when that construction has been settled by the decision of its highest judicial tribunal.”
 

 Now what can be more peculiarly a matter of local law, and to be ascertained and settled by the State tribunals, than the character and extent of the jurisdiction of their courts, and the effect to be given to their own orders and judgments.
 

 I suppose it will not be denied but that each State has the right to prescribe the jurisdiction- of her courts, either by the acts of her Legislature, or as expounded by the courts themselves ; and that,' if that jurisdiction is settled by a long course of decision, or, in respect to the particular case, by the authority which has a right to settle it, this court, professing to administer the laws of the State as they find them, and acting upon their own principle, as well as the principle of the thirty-fourth section of the Judiciary Act, cannot disregard the jurisdiction as thus settled."
 

 It is no answer to this view to say, that the question here is the construction of a private statute of New York. That assumes the very point in controversy. The point is, Can this court reach the question involving the construction of the statute ? That depends upon the prior one, whether Chancellor Kent acted in the exercise of the jurisdiction of his court in expounding the statute. If he did, the question upon its construction is concluded ; and whether the construction be right or wrong is a matter not inquirable into in this collateral way.
 

 The case, therefore, comes down to a question of jurisdiction, — a question which Chancellor Kent himself settled in this very case in 1815, which settlement has since been confirmed by the highest tribunals in the State, and about which no one of them there could be brought to entertain a doubt.
 

 I must be permitted to think, therefore, that, looking, at the question as' an original one, Chancellor Kent was right in the jurisdiction that he exercised in administering the acts in question ; and that, whether so or not, it belonged to the courts of that State to expound and settle the limit of his jurisdiction ; and that, when so settled,-it becomes a rule of decision for the Federal courts sitting in the State, and administering her laws; and that therefore the order of the Chancellor in question was conclusive upon the matter before him, and is not inquirable into collaterally in a court of law.
 

 
 *560
 
 But were we compelled to go behind the order, and to reexamine the case, as upon an appeal,' we perceive no difficulty in sustaining it.
 

 When Clarke applied to the Legislature, in 1815, for relief, he was the owner of the life estate, and of the ultimate remainder in the premises, the residue belonging to the children ; and for this reason, doubtless, the act which was passed at that time left it discretionary with the Chancellor to determine the portion of the proceeds that should belong to Clarke, individually, and also as trustee for the children.
 

 And under this provision of the law, before any order was made for the disposition of the proceeds, the court ordered a reference To the master to ascertain the amount of his debts, and what portion of them had been contracted for the maintenance of the family and education of the children.
 

 The interest of Clarke in the proceeds was properly applicable to his own debts, as well as to the debts contracted for the support of the family; and after the coming in of the report which exhibited the amount of the debts, and for what puposes contracted, the order for the application of the proceeds was made. This is the order referred to and confirmed by the act of 1816.
 

 It, in effect, applied what was regarded by the Chancellor as the interest of Clarke in them to the payment of his own debts, the amount of that interest, as we have seen, having been left to be ascertained by him in the exercise of his judgment in the matters. That Clarke had a considerable interest is apparent, having united in himself two portions of the estate. That the Chancellor erred, in the exercise of .his judgment in dividing the proceeds of the estate between Clarke and his children, according to their respective interests, does not appear, nor can it be shown from any thing to be found in the record; much less can a want of power to act,- or an excess of power in acting, be predicated of the exercise of any such discretionary authority.
 

 Then, as to the application of a portion of the fund belonging to the children for the maintenance of the family, as well as their own education.
 

 From the cases already referred to on that subject, we have seen that this is within the acknowledged powers of the Court of Chancery, and of which it is in the habitual exercise, in cases where the parents are in narrow circumstances, and unable to furnish the means of support. The application is made for the benefit of the children, that they may have the comforts and enjoyments of a home, with all the wholesome and endearing influences of the family association.
 

 
 *561
 
 Even beyond this, small annuities have been settled upon the father and the mother, in destitute circumstances, out of the estates of the infant children.
 

 It was a knowledge of these principles, which were familiar to the mind pf - Chancellor Kent, as was the whole system of the powers and duties of his court over the persons and estates of infants, that dictated the granting of the order in question ,* and, in my judgment, so far as the power and authority of the co.urt was concerned, which is the question here, it requires but an application of these principles to the facts before him to enable u's to see that it was well warranted.
 

 Again, it is said that the children were not parties to the proceedings. The same may be said concerning the exercise of all the powers of the Court of Chancery over the estates of infants.
 

 The answer is, the proceeding is not an adversary suit. The estate is regarded as a fund in court, and the infants as wards of the court; the Chancellor himself, as the general guardian, exerting his great power, either inherent or vested by positive law, over a class of persons specially committed to his care, for their own benefit, for the proper management of their estates, real and personal, for their maintenance and support, for their education and advancement in life.
 

 It is a proceeding
 
 in rem,
 
 the property itself in
 
 custodia legis;
 
 and if a guardian had been appointed, it would have been but a desecration of the power of the court, which, in the proceeding before us, was exercised by the court itself, through the agency and instrumentality of its officers.
 

 - The rule in respect to adversary suits against infants, requiring the appointment of a guardian,
 
 pendente
 
 lite, has no sort of application to the proceedings in question.
 

 It has also been argued, that the order of the Chancellor, authorizing Clarke to sell and convey the premises in question, required a certificate of the approval of one of the masters of the court to be indorsed on the deed; and that no such certificate has been given or indorsed thereon.
 

 The deed to De Grasse was executed on the 2d of August, 1821; and on the next day it appears that the master was a witness to prove the execution before the commissioner who took the acknowledgment.
 

 . It further appears, that on the same day, the master, having had the life estate of Clarke in the premises previously conveyed to him, in trust, in Order to complete the title, indorsed on the back of the deed, and exeeuted/inder his hand and seal, a release of. this life interest to the purchaser, and duly acknowl
 
 *562
 
 edged the same, that it might be recorded in the register’s office along with the deed. This was done, as the master recites in the release, at the request of the trustee, and for the purpose of completing the title.
 

 One can hardly conceive of a more effectual approval, than is to be derived from these, acts of- the master; for without the release of the life estate, which he held in trust, the title could not have been perfected, and the sale- must have fallen through. The release enabled the trustee to complete it, and invest De Grasse, the purchaser, with the fee.
 

 But the courts of New York in the case already referred to have held, that, upon the true construction of 'the order, the approval- of the master was not necessary, as the direction in that respect was limited to conveyances by the trustee in satisfaction of debts. Even if this construction should be regarded as doubtful, or that requiring the approval was thought to be the better one, inasmuch as this construction has been given by the highest court of a State upon this very title, in a case in which its judgment was final, the habitual deference and' respect conceded by this court to the decisions of the State courts upon their own statutes and orders of their courts, would seem to render it conclusive.
 

 This- view was directly affirmed, and acted on, in the case of The Bank of Hamilton
 
 v.
 
 Dudley’s Lessee, 2 Peters, 492. That, as is the case 'before us, was an action of ejectment by the heir, to recover a tract of land situate in the city of Cincinnati. The defendant held under a deed made by administrators, upon a sale under an order of the Court of Common Pleas for- the County of Hamilton, which possessed the powers of an Orphans’ Court.
 

 The title depended upon the effect to be given to the order under which the sale took place. It was made at the August term, and entered as of the May term preceding. It was alleged that, though granted, at the May term, the clerk had omitted to enter it. The law conferring the powers of the Orphans’ Court upon the Common Pleas had been repealed between the May and August terms; and the question was whether the order was a nullity, or valid until set aside.
 

 The sale had taken place at an early day, and the property had become of great value. The case was most elaborately argued. The action of this court, independently of the principle decided in the case, is worthy of remark.
 

 Chief Justice Marshall, in delivering the opinion, observed, that the case had been argued at the last term, on the validity of the deed made by the administrators; but as the question
 
 *563
 
 was one of great interest, on which many titles depended, and which was to be decided upon the statutes of Ohio, and as the court was informed that the case was depending before the highest tribunal of the State, the case was held under advisement.
 

 The State court held, that the order of the Court of Common Pleas, entered at the August term as of the preceding May term, was
 
 coram non judice,
 
 and void; and that the deed under which the defendant derived title was, of course, invalid.
 

 This court held, that the judgment of the Supreme Court of Ohio should govern the case. I will give its language.
 

 “ Th¿ power of the inferior courts of a State,” said the Chief Justice, “to make an order at one.term as of another, is of a character so peculiarly local, a proceeding so necessarily dependent on the revising tribunal of the State, that a majority consider that judgment as authority, and we are all disposed to conform to it.”
 

 I will simply add, that the Court for the Correction of Errors in New York possessed a revising power in all cases over the orders and decrees of the Chancellor, and that that court has. held, upon'this, very title, not only that the order in question was an order entered by him acting as a court, but, in expounding it, that the deed of conveyance given to De Grasse under it did not require the approval of a master. Further comment to show the identity of the two cases would be superfluous.
 

 But I forbear to pursue this branch of the case farther.
 

 The validity of the execution of the deed to De Grasse by the trustee, as it respects thé alleged want of approval, stands, —
 

 1. Upon the acts of the master in the execution of it, as a substantial approval within the meaning of the order; and,
 

 2. Upon the decision of the highest judicial tribunal of the State, whose laws we are administering, that, upon a fair interpretation of the terms of the order, an approval was not essential.
 

 It has also been argued, that, according to the true construction Of the order, the sale should have been for cash, and that here it was otherwise.
 

 But this is an action at law; and the deed on the face of it show a cash consideration of $ 2,000. The nature of the consideration was not inquirable into, and should have been excluded, at the trial. If the ,compla’inant had sought to invalidate the proceedings on that ground, he should have gone into a court of equity, where the question cibuld have been appropri
 
 *564
 
 ately examined, and justice done to all the parties. That it was not examinable in a court of law is too plain for argument. The recital of the considerations can no more be varied by parol proof than any other part of, the deed.
 
 (2
 
 Phillips on Ev. 353, 354,
 
 2
 
 C. &. H., note 289, and cases there cited; 1 ib., note 228, p. 384; 7 Johns. 341; 8 Cow. 290;
 
 2
 
 Denio, 336; 4 N. Hamp. 229; 1 J. J. Marsh. 388, 390.)
 

 I have thus gone- over the several grounds relied on for the purpose of impeaching the title of the defendant to the premises in question; and, although in the minority in the judgment given, haye done so, not so much on account of the magnitude of the" interest depending, which is great-of itself, as of the importance of the principle involved; and upon the application of which the judgment has been arrived at.
 

 Notwithstanding several questions have been brought within the range of the discussion, there are but two, in reality, .involved in the determination of the case. 1. The effect to be" given to the order of Chancellor Kent made on the 15th of March, 1817; and 2. The execution of the conveyance by C’arke, the trustee, under this order. ;¡> ...
 

 If the order was made by the Chancellor in ;the ^exercise of his jurisdiction as a court, his judgment was cónblusive in the matters before him; and there is an end of that question.: It affords an authority to sell and convey, that cannot be controverted in a court of law. And the-validity,of the' de'ed.executed under it stands upon an equally solid foundation. ■ r - .
 

 The title of the defendant, therefore, would seem to be beyond controversy, were it not for the principle against which we have been contending, and which imparts to the case its greatest importance, namely, the right claimed for this court to inquire into the nature and character of the jurisdiction exercised by the Chancellor in making the order coming before us collaterally; and as this court determines that jurisdiction to be general or special, to refuse or consent to go behind his judgment, and reopen and rejudge the merits of the case; and -according- to the opinion entertained upon that question, to affirm or disaffirm the validity of all acts and proceedings that have taken place under it. And this, too', in a case where the jurisdiction thus exercised by the Chancellor has been settled by himself in his own court, under the State laws, and affirmed by the judgment of the highest judicial tribunals of the State.
 

 It is apparent that, if this principle becomes ingrafted upon the powers of this court, and is to be regarded as a rule to guide its action in passing upon the judgments of the State courts coming up collaterally, a revising power is thus indirectly
 
 *565
 
 acquired over them, in cases where no such power exists directly, under the Constitution or laws of Congress. For, if the right exists to inquire into the kind and character of the jurisdiction, without regard to' that established by the laws and decisions of the States; and to determine for itself whether the jurisdiction is general or special, and if the latter, to go behind the judgment to see whether the special authority has been strictly pursued, there is no limit to this revising power, except the discretion and judgment of the court.
 

 The principle will be as applicable to every State judgment coming before us collaterally, as to the one in question. It denies, virtually, to the States the power, in the organization of her courts, to prescribe and settle their jurisdiction, either by the acts of" her Legislature, or the- adjudication of her judicial tribunals.
 

 I cannot consent to the introduction into this court of any such principle, and am, therefore, obliged to refuse a concurrence in the judgment given.