BOYKIN v. BOYKIN.

1. The words of a will were: "I direct that all the rest of my real
   estate shall be kept undivided until the death of my wife, to be
   worked by the slaves of my estate and those which I shall in this
   bequeath to my wife, under the control and management of my
   executors; and from and immediately after her death I devise the
   said real estate to my sons, equally to be divided among them, share
   and share alike, to them and their heirs forever. And should any
   of my sons die before the time herein appointed for the division of
   my real estate and should leave issue living at that time, then I
   direct that such issue shall take among them, share and share alike,
   the same portion of real estate to which their parent would have
   been entitled if he had survived my said wife, to them and their
   heirs forever. And if any of my sons shall arrive at the age of
   twenty-one years before the death of my said wife, I direct that
   such son or sons shall be permitted to cultivate, each for himself,
   such a part of real estate as shall be allotted for that purpose by
   my wife and executors until the final division, when he or they
   shall receive his or their own share." *Held*, that the devise created
   vested interests in the sons living at the death of testator, and only
   the division and possession were postponed to the death of the
   widow; therefore the interest of two sons who died intestate and
   without issue after testator, but before the widow, vested in their
   mother and other heirs at law.
2. *Held, further*, that in the case of the death of such sons without
   issue no cross-remainders were provided for, nor was it necessary
   that the court should imply them.
3. The will also bequeathed certain slaves to the widow and directed
   that "they may be worked on my general estate under the control
   of my executors, who shall, as long as she lives, pay to her an-
   nually out of the proceeds of my general estate the sum of $600 in
   full compensation for the use, labor, and profits annually of said
   slaves." *Held*, that this provision for the widow ended with the
   emancipation of the slaves.
4. The executors were authorized and directed to keep the widow sup-
   plied as long as she lived with suitable carriage and a pair of car-
   riage horses, to be purchased at the expense of the estate whenever
   the executors "may deem it necessary." And they were also re-
   quired to pay out of the undivided estate for all repairs and renew-
   als of furniture for the dwelling house of testator (which was
   given to the widow for life) whenever directed by the executors, to
   be continued during the widow's life-time. All the provisions of
   the will for the widow were in lieu of dower. After testator's death,

33

and after the war, the widow found a change of residence neces-
sary, and exchanged, with her surviving son, the testator's home-
stead for a house in town.   *Held*, that the widow was entitled to
the carriage and horses, and to have the furniture in her town
house repaired.

5.   There was a legacy to the widow of "$2,000 in six per cent. stocks
of the State of South Carolina."   The testator owned some stocks
of this state at his death.   *Held*, that the legacy was demonstra-
tive and not specific, and that the widow was entitled to demand
the same, with interest at six per cent. (which is the rate of inter-
est on such securities).

6.   The delay of the widow in asserting her claims, her acquiescence in
the payment of other legacies, and her knowledge of the sale of
testator's state stocks, did not estop her under the circumstances of
this case.

7.   The several provisions in favor of the widow being in lieu of dower,
will not abate for the payment of debts, but they are not a charge
upon the lands devised; and the use of the state stocks by the exe-
cutors to pay to her daughters their legacies which were charged up-
on such lands, does not entitle her to be subrogated to their rights.

Before HUDSON, J., Kershaw, February, 1883.

This was an action by Sallie W. Boykin against Thomas L.
Boykin, as executor of the will of Burwell Boykin, deceased, and
against all the devisees and legatees under said will, and against
certain creditors of the said Thomas L. Boykin.   The opinion
states the case.

The Circuit decree, omitting its statement, was as follows:

I will here observe that there has been no accounting taken of
the actings and doings of the executor, T. L. Boykin, so that
we are not informed of the condition of the estate in his hands,
except that it is stated in argument of counsel that he is totally
insolvent; and we may presume that whatever of the personal
estate was not destroyed by the results of the war, and has not
been paid to legatees, is not available.   But that is yet to be
judicially ascertained upon an accounting.

All litigants have expressed a desire to obtain a construction
of the will, and an adjudication of the main legal questions
preparatory to an accounting and settlement.   This we think
proper, and to this duty we will at once address ourselves, and

in doing so will take the sections of the will in dispute in their regular order.

The first and second clauses of the will present no question difficult of interpretation, as the language is plain and unambiguous in regard to the rights and privileges of the wife and daughters of the testator. It is in evidence that the two hundred acres of land were marked off and admeasured, and that the widow and daughters continued to dwell in the family homestead, being provided for by the executor as the will directs, though not fully, and the repairs and renewals were not well kept up. So matters continued without any effort on their part by legal steps to enforce a better performance of duty on the part of the executor until a few years ago, when the widow sold to Thomas L. Boykin her life estate in the premises, in exchange for an estate in fee in a residence in Kirkwood, in the suburbs of Camden.

We do not think that under the circumstances, after so long a delay, she is entitled to have an estimate made of the arrearages of the annual cost of what should have been expended by the executor in keeping up the establishment on the plantation, and now recover that as a gross sum from the executor; but we do think that she has a right to demand of him a suitable carriage and pair of horses, and a proper repairing and renewal of her present household furniture. Of course, the altered condition of things, and the present age and circumstances of his mother, should be taken into consideration in deciding upon a proper outlay in this respect at this juncture. The estate has been greatly reduced by the casualties of war. Perhaps the executor has been also guilty of *devastavit*, but how far is yet to be determined, and much depends upon the evidence on this point. We cannot prejudge him.

Nor do we experience much difficulty and hesitation in construing the third clause of the will, and feel free to say that each of the three sons surviving the testator took under that clause a fee in the one-third of the body of land devised. The testator directs this fee to go absolutely to the issue of such of the sons as should die before the mother, leaving issue surviving, but does not provide how the share of a son should go in the event he should die before the mother and leave no issue to take.

It is argued that his purpose and intention were that in such event the son's share should vest in the surviving sons, and that Eugene and John having successively died unmarried, and without issue, by right of survivorship Thomas L. Boykin has become vested with the entire devise. If such had been the testator's intention, it would have been very easy for him to have so declared. In this clause cross-remainders are not created by express words, nor are they raised by necessary implication. I have carefully examined the authorities relied upon in support of this doctrine of cross-remainders, but in my judgment they do not sustain the construction contended for by the creditors of T. L. Boykin. I hold that as Eugene and John died leaving no issue to take, their respective shares in fee vested in those who filled the description of their heirs at law at the dates of their deaths respectively. But, of course, the period of partition and enjoyment in severalty remains as the testator has fixed it, to wit, the death of the widow. Until then the land is to be kept together for the use of the estate, as prescribed by the will. In refutation of the cross-remainder theory, see *Smither* v. *Willcox*, 9 *Ves.*, 233, referred to in 2 *Jarm. Wills*, 493, and note.

We agree entirely with the master in his construction of section fourth of the will. The six hundred dollars to be paid annually to the widow was the testator's estimate of the compensation which should be paid her for the annual labor and services of her eight negro slaves on the plantation, which was to be worked for the benefit of the estate. The widow having accepted the slaves, as well as her entire legacy, in lieu of dower, and the slaves having been emancipated, this source of income was dried up. The *corpus* and income became a loss to her.

The legacy of $2,000 in state stocks I do not regard as specific, but merely pecuniary and general. The remarks of the learned author of Williams on Executors, Vol. 2, *pages 999 and 1000, are in accord with Jarman on Wills, and are adopted by Redfield, and sufficiently support me in holding that this legacy is not specific, and must therefore be paid, but I think with only six per cent. interest from July 27, 1862. But how it is to be paid is a question made interesting by the earnestness and zeal displayed in the argument of counsel. Clearly, the executor is

responsible under the testimony as it comes to me, although, as I have before remarked, the extent of his *devastavit* has not been fully enquired into. He has assented to the legacy, has paid less favored legacies, and has disposed of the rents, issues, and profits of the land, and, to some extent, the land itself. He does not interpose the plea of the statute of limitations, nor could he do so whilst he maintains to this legatee the relation of trustee.

The provision for the widow stands upon high grounds—higher in law and in equity than that of ordinary legatees, mere volunteers. She is a purchaser, or rather the testator became, by her acceptance of his offers, a purchaser of her interest in his real estate, and she a vendor for valuable consideration. So highly is her legacy esteemed, that in case of a deficiency of assets personal, her claim does not ratably abate with other legacies, but must be paid, even if thereby the legacies of the children should be defeated in whole or in part. 2 *Wms. Ex'rs*, *1169, 1170; 1 *Roper Leg.*, *432. Such a claim of a widow is so greatly favored, that before she will be driven to her election she will be allowed time in which to be fully informed of the real condition of the estate, so as to enable her knowingly and understandingly to make her choice. Should she elect hastily and unadvisedly, she will be allowed to recall her imprudent election. Here, however, she *has* elected, and too long a time has elapsed to think of asking to recall, nor does she do so. She sues now to recover the provision made for her in lieu of dower, declaring very truthfully and properly that she has made her election.

Her counsel insists, however, that her legacy is not only favored in law, and preferred to one that is a mere bounty, but that it is a charge upon the specific devises of land—not that the testator has so declared it to be, but that the law so declares it. In this they err. The law does not only not so declare, but the very nature of the acceptance of such a legacy implies a renunciation of all interest in the land, saving what may be expressly, or by necessary implication, contained in the legacy itself, as where it is made a charge on land, or payable out of the usufruct, &c. There is nothing of the kind in the legacies given to this widow, except the current expenses of the household, repairs, and renewals of furniture, &c., whilst the

wife and daughters live in the family residence, and even those outlays are to be supplied from the proceeds and income of the general estate, and not from the sale of any part of the land.

In the absence of any specific directions to that effect in this will, these legacies to the wife in lieu of dower are not charges on the land specifically devised.   Therefore, should there be a deficiency of personal assets, so that there must be a marshalling of assets as between legatees, we know no rule of law nor of equity that will enable the widow to subject the land specially devised to the payment of her claim. 3 *Jarm. Wills*, 530, 531 ; 3 *Red. Wills*, 369, citing *Forrester* v. *Lord Leigh, Amb.*, 171 ; *Scott* v. *Scott, Amb.*, 383 ; *Herne* v. *Meyrick*, 1 *P. Wms.*, 201 ; *Clifton* v. *Burt, Ibid*, 678.  As, however, all the debts have been paid, and all other legatees settled with, and as the landed estate is still undivided, and required to be kept together and managed for the use of the family until her death, and since hers is a favored legacy, every advantage and preference must be granted her henceforth in getting what justly belongs to her.

It is, however, contended, that as the state stock was taken by the executor to satisfy in part the legacies to the girls given in the 9th clause of the will, which legacies are made a charge on the land, the widow now has the right to be subrogated to their rights in the premises, and thus to resort to the land for payment.   But only one thousand dollars of the state stocks was so applied (the balance being paid in other funds and stocks), and this was done many, many years ago, and with her full knowledge and consent.   And we do not perceive how, at this late day, having so long acquiesced in this act of the executor, she has any equity, by subrogation or otherwise, to demand payment of her legacy out of a specific devise.   She has a preferred claim upon all the personal assets in the hands of the executor, and these, perhaps, will consist of the rents and profits of the undivided realty.   If from this source she cannot be paid, she is entitled to a personal judgment against the executor, which, however, as a lien upon his individual property, including his devise in fee, will take rank only from its date, and must be junior to subsisting outstanding liens, such as mortgages and judgments.

Now, it appears that Thomas L. Boykin has undertaken to

mortgage portions of his land, by metes and bounds, and to convey by deed other parts; and that under decrees of foreclosure and sale, still other parts have gone into the hands of purchasers. Clearly, he had no right to do more than mortgage or sell his undivided interest in fee in this land. In so far as any of these purchasers or lien creditors may have such a deed or mortgage, to wit, of the right, title, and interest of T. L. Boykin, he or she will have a lien superior to a personal judgment recovered by the plaintiff against the executor in this action; but, otherwise, it may turn out that her judgment will take priority. Much depends upon the nature of these liens and purchases, and the outcome of the partition which may be made after the death of the plaintiff. Until that time the possession of each and every of these purchasers must be at the will of the tenants in common, or rather the devisees of the land and their heirs, among whom T. L. Boykin is only one of a goodly number. These remarks do not apply to the 200 acres bought of his mother. That is his absolute property, with contingent limitations.

The compromise agreement spoken of by the referee I have never seen, but learn that it is signed only by the counsel for the parties, whilst I believe there are minors in interest. I do not deem it necessary to go further in this decree than to adjudicate the widow's rights and to interpret the will, and the parties and these purchasers may hereafter adjust their claims according to their desire and agreement, whatever that may be. I can only say that none of them have, against the consent of the devisees, a right to the possession of any of the land until after the death of the plaintiff, and not then, even, unless it be that they have purchased the interest of T. L. Boykin, and can stand in his stead in the partition.

As the insolvency of T. L. Boykin is conceded, and as the rents and profits are likely to constitute the only fund out of which the plaintiff can realize anything, which rents and profits have been for a short time collected and disbursed by the master of this court, who is dead, a receiver must be appointed to take charge of the estate with all convenient speed.

It is therefore ordered, adjudged, and decreed: *First.* That the sons, as devisees under the third clause of the will of Bur-

well Boykin, deceased, took each for himself a vested interest in fee, transmissible to the issue of such as should predecease their mother leaving issue surviving, and to the heirs at law of such as predeceased their mother, leaving no issue surviving, but that the period of partition and enjoyment in severalty of all shares is postponed to the death of the plaintiff.

*Second.* That the plaintiff do recover of the said executor the sum of $2,000 with interest thereon at six *per centum per annum* from July 27, 1862, with leave to issue execution thereon against said executor, to be levied *de bonis testatoris*, if any there be unadministered in his hands, and if not, then *de bonis propriis*, but not to be levied of any of the real estate devised under the said third clause of said will.

*Third.* That the plaintiff do likewise recover of said executor a sufficient sum of money to buy for her and daughters a carriage and horses, and to repair and renew the furniture in her present dwelling, with leave to issue execution to enforce payment upon the same terms as that above provided. And in order to ascertain said sum, it is hereby referred to the clerk of this court as special master to take testimony and report a suitable sum of money for these purposes, the master being disqualified.

*Fourth.* Leave is hereby given to any of the parties to this action to apply at the foot of this decree for the appointment of a receiver, with information as to the amount of the bond necessary to be given, and to the said special master it is referred to ascertain and report a suitable person to act as receiver of the said rents and profits and estate generally, and the proper amount of said bond.

*Fifth.* That the said rents, issues, and profits be applied to the payment of the amounts decreed herein to the plaintiff, in preference to any other claim, and to the costs of this action, in case the said executor be not able to pay the same, which he is hereby directed to do.

*Sixth.* That the parties interested have likewise leave to apply at the foot of this decree for further orders touching the lands in possession of those who hold under pretended titles from Thomas L. Boykin.

*Seventh.* That it be referred to the said special master to audit and report upon the accounts of the said Thomas L. Boykin, as executor as aforesaid, with leave to report upon any special matter in regard thereto, as well as in regard to any other matters arising under the pleadings in this action, and not herein finally and fully adjudicated.

From this decree the several parties appealed upon the grounds stated in the opinion of this court.

*Mr. W. H. Lyles,* for plaintiff.

*Messrs. W. Z. Leitner, Buist & Buist,* and *DeSaussure & Son,* for creditors.

October 10, 1884.   The opinion of the court was delivered by

Mr. Justice McGowan: Burwell Boykin, late of Kershaw county, departed this life in 1861, seized and possessed of a handsome estate, consisting, among other things, of nearly 5,000 acres of valuable land in one body on the east side of Wateree River. He left surviving him a widow, Sallie W., and seven children, Eugene, John, Thomas L., Mary L., now the wife of Everard B. Cureton, Harriet A. Boykin, Sallie W., now the wife of T. H. Clarke, and Flora Boykin, for whom he made liberal provision by will. He gave to each of his sons, except Thomas L., $200, and to each of his daughters $4,000, the latter to be raised out of any money due him, and belonging to his estate, not disposed of by the will, and in case there should not be a sufficiency for the purpose mentioned, then the same to be considered as a charge upon the lands. He then provided as follows:

"Section 1. I desire that my wife and children may dwell together in my dwelling house, where I now reside. * * *

"Sec. 2. To my wife, Sallie W. Boykin, for and during the period of her natural life, and no longer, and subject to the first section of this will, I devise the dwelling house where I now reside, and all the out-buildings attached thereto, together with all and singular the household and kitchen furniture, of every description, belonging to the premises, and also 200 acres of the tract of land whereon said dwelling house and out-buildings are

situated, to be admeasured, and the buildings thereon defined by my executors, to be hereinafter named.   *   *   *   *   And I hereby empower and authorize my said wife to divide the said furniture, by will or otherwise, among my children in any manner she pleases; but should she fail or refuse to do this, at her death I direct my executors to take and hold the same for distribution under the residuary clause of this will. And I hereby charge the expenses of all needful repairs of said dwelling house and out-buildings and repairs and renewals of furniture for the same upon my undivided estate, as it may be from time to time, when such repairs and renewals shall be directed by my executors, to be continued during the life of my said wife, but no longer.

"Sec. 3.. I direct that all the rest of my real estate shall be kept undivided until the death of my said wife, to be worked by the slaves of my estate and those which I shall in this bequeath to my wife, under the control and management of my executors; and from and immediately after her death I devise the said real estate in this section referred to, to my sons, equally to be divided among them, share and share alike, to them and their heirs forever. If, however, I shall in the mean time by deed convey any portion of the said real estate to any of my sons, then the part so conveyed shall be taken and held by him as his portion of real estate to which he would otherwise have become entitled under the provisions of this section of my will. And should any of my sons die before the time herein appointed for the division of my real estate, and should leave issue living at that time, then I direct that such issue shall take among them, share and share alike, the same portion of real estate to which their parent would have been entitled if he had survived my said wife, to them and their heirs forever. And if any of my sons shall arrive at the age of twenty-one years before the death of my said wife, I direct that such son or sons shall be permitted to cultivate, each for himself, such a part of real estate as shall be allotted for that purpose by my wife and executors, until the final division, when he or they shall receive his or their own share, &c.

"Sec. 4. To my wife, Sallie W. Boykin, to her and her heirs forever, I give and bequeath the following named slaves, to wit:

Bremer and Tabby, Hester and Sandy, children of said Tabby, Isaac, Sandy, Peggy, and Bob Lord, with the present and future increase of the females among them, which said slaves may be worked on my general estate under the control of my executors, who shall, as long as she lives, pay to her annually out of the proceeds of my general estate the sum of six hundred dollars, in full compensation for the use, labor, and profits annually of said slaves.

"Sec. 5. To my wife, Sallie W. Boykin, to her and her heirs forever, I give and bequeath two thousand dollars ($2,000) in six per cent. state stocks of the State of South Carolina, and I hereby authorize and direct my executors to keep her supplied as long as she lives with suitable carriage and a pair of horses, to be purchased at the expense of my estate whenever they may deem it necessary, &c.

"Sec. 6. All the rights, privileges, devises, and bequests in this will and testament made and allowed to my said wife, Sallie W. Boykin, are intended, and by her must be taken, only in lieu of her right of dower in each and every portion of 'my real estate," &c.

The testator nominated his brother, A. H. Boykin, and his sons, Thomas L. Boykin and Burwell Boykin, as executors, but only Thomas L. Boykin qualified. He returned an inventory and appraisement of the estate, which showed that in round numbers, the negro slaves were valued at $60,000, the stock, plantation tools, &c., at $17,000, and the bonds and notes at $28,000. He paid the pecuniary legacies to the daughters as they came of age or married; but to enable him to do so, certain portions of the lands were assigned to the younger daughters, viz., tracts Nos. 1, 2, 3, and 4, aggregating 544 acres and a fraction, were assigned to Harriet A. Boykin, and tracts Nos. 5, 6, and 7, aggregating 332 acres, were assigned to Flora Boykin, in 1875. And in order to complete the payment of the daughters, also all the six per cent. state stock belonging to the estate, was sold, except the nominal amount of $1,000, which is still in the hands of the executor, but of no value.

The widow, Sallie W., accepted the provisions of the will in lieu of her right of dower in the lands, the 200 acres, including

the family mansion, were run off for her, the slaves bequeathed to her were employed on the undivided lands as directed, and the $600 paid to her annually; but at the end of the war, the slaves were emancipated, and the value of the choses greatly reduced, if not destroyed. The two younger sons, Eugene and John, died intestate and unmarried, and an arrangement was made by which the widow, Sallie W., disposed of her life estate in the 200 acres, and purchased a house and lot in the town of Camden, whither she removed.

It seems that the executor had never paid her the legacy of $2,000 in six per cent. state stocks, and now refusing even to continue the annuity of $600, and proper expenditures for renewal of furniture, carriage and horses, &c., she instituted these proceedings, alleging that all the available assets of the estate had disappeared, and praying that the executor should be required to pay her the $600 annually, the legacy of $2,000 in six per cent. state stocks, and money sufficient to renew her furniture and to purchase a carriage and horses as directed by the will; that the sums so ascertained to be due her should be paid out of the rents and profits of the undivided lands, which were to be kept together during her life, and were specifically charged with keeping up her establishment; and should that not be sufficient for the purpose indicated, then that the same should be adjudged to be a charge upon the said lands.

At this stage of the proceedings, it transpired that there were persons other than the devisees who claimed to have an interest in the lands; that Thomas L. Boykin, the executor, being involved, possibly insolvent, had undertaken to sell certain parcels of the undivided lands, and to mortgage other portions to secure his individual creditors; and thereupon these persons so claiming were made parties defendant, and the following state of facts, given in the most general terms, appeared:

On May 31, 1872, Thomas L. Boykin contracted with Louis D. DeSaussure for agricultural advances, and to secure the same executed a mortgage of a certain tract of land described as containing 893 acres, with metes and bounds, &c. On January 8, 1873, he also contracted with Witte Brothers for advances to the amount of $9,000, and to secure the same executed a mortgage

of 2,000 acres of the estate lands, with metes and bounds, &c. On March 1, 1873, he also executed a mortgage of 500 acres of the said land to secure a debt of $600 due to Charles B. Taylor, assigned to A. H. H. Stuart. On May 16, 1874, he also gave to John A. Armstrong a note for $1,573.54, and to secure it executed a mortgage of "all his undivided interest in the estate of Burwell Boykin, in which his mother, S. W. Boykin, had a life estate," &c. He also gave other conveyances of portions of the lands; but it is unnecessary now to state them in detail, as the Circuit judge did not undertake to adjudge any question in the case except "the widow's rights and to interpret the will."

These creditors and alienees of T. L. Boykin made vigorous opposition to the claims of the widow, the plaintiff. The issues were referred to the master, who took the testimony and made his report. Upon exceptions to this report, the cause came on for a hearing by Judge Hudson, who held that the sons of Burwell Boykin took under the will vested interests in their respective shares of the land; that the widow was not now entitled to the annuity of $600; but that she was entitled to recover the legacy of $2,000 in state stocks, and directing its payment out of the rents and profits, but declining to make it a charge upon the lands. From this judgment all the parties appealed. We think all the grounds taken by the creditors of T. L. Boykin are embodied in the appeal of Louis D. DeSaussure, which are as follows:

"That it was error in the Circuit judge to hold: 1. That the legacy of $2,000 to the plaintiff is not a specific legacy. 2. That the sons of the testator, Burwell Boykin, do not take as a class, but directly. 3. That the lands must be rented out and a receiver appointed to take charge of the rents to meet the support of the plaintiff. 4. That the plaintiff is entitled to a future provision for carriage and horses, repairs of furniture, &c., upon the grounds following:

"*First.* That the $2,000 of state stocks was a specific legacy, and if a *devastavit* as to it has been committed, the plaintiff must look to the executor by whom the *devastavit* was committed, and not to the testator's estate.

"*Second.* That the third clause of the testator's will, as inter-

preted by the whole contents of the will, clearly evinces an intention on the part of the testator to provide for classes; and the third clause indicated his sons as the class to take his lands.

"*Third.* That the defendant, Thomas L. Boykin, being the survivor of the class designated in the third clause of the will takes all the real estate, and his mortgages or conveyances of such real estate will give priority over any and all claims of the plaintiff upon such real estate for support, according to the terms of the will and circumstances.

"*Fourth.* That the provision in the second clause of the will in relation to repairs and renewal of furniture was for repairs and renewals as to furniture to be used in the dwelling house provided for the plaintiff in such clause, and her voluntary relinquishment of such dwelling-house was an abandonment of all claim for 'repairs and renewals of furniture for same.'

"*Fifth.* That the provision for a carriage and pair of horses for the plaintiff was dependent upon the discretion of the executors 'to be purchased at the expense of my estate whenever they may deem it necessary,' and the sole qualified executor having by his answer stated that such were furnished as long as he thought necessary under the circumstances, such provision, if now deemed necessary to be made, can only be at the expense of the whole estate, and by contribution among all the devisees."

### PLAINTIFF'S EXCEPTIONS.

1. "Because his honor held that the plaintiff is not entitled to the annuity of $600 bequeathed to her in the fourth clause of the will of Burwell Boykin, deceased.

2. "Because his honor held that plaintiff is entitled to interest only at the rate of six per cent. per annum on the legacy of $2,000 'in six per cent. state stocks' bequeathed to her in the fifth clause of the will.

3. "Because his honor did not hold that all of the legacies given to plaintiff by the will, being given and accepted in lieu and bar of dower, were chargeable by law and the terms of the will upon the real estate devised.

4. "Because his honor did not hold that the defendant, Thomas

L. Boykin, having exhausted the personal estate of his testator
in the payment of the legacies to Mary L. Cureton and Sallie
W. Clarke, inferior in grade to plaintiff's legacies as to the per-
sonalty, but charged upon the land, the plaintiff is entitled to be
subrogated to the rights of Mrs. Cureton and Mrs. Clarke, and
to have so much of the land devised sold as would be sufficient
to satisfy her legacies.

5. "Because his honor did not hold that the plaintiff had a life
estate in the whole of the real estate.

6. "Because his honor held that none of the land devised was
subject to the payment of these legacies to the plaintiff, when he·
should have held that at least the interest of Thomas L. Boykin
in said lands should be subject to the payment of said legacies,
under the *fi. fa.* authorized against him *de bonis propriis.*

7. "Because his honor undertakes to decide and determine how
the judgment authorized against Thomas L. Boykin for these
legacies will rank with respect to prior judgments against him or
conveyances and encumbrances made by him without a sufficiency
of evidence to show how they stand, and without that question
being before him or involved at this juncture of the proceedings."

The action was brought by Sallie W. Boykin, widow of Bur-
well Boykin, deceased, for the recovery of legacies and to enforce
the execution of other provisions of his will in her favor.    In
the progress of the cause, questions arose between Thomas L.
Boykin, the executor, and his creditors.    While it was proper to
hear these creditors in opposition to the claims of the widow,
which touched the property disposed of by the will in which the
said Thomas L. had an interest, the Circuit judge did not under-
take to adjudicate the rights of the creditors or adjust equities
between the defendants; so that there is no question before this
court except as to the rights of the widow, and as incidental
thereto the construction of the will of Burwell Boykin.

*First.* As to the devise of the lands in the third clause.    The
important words are as follows : "I direct that all the rest of my
real estate shall be kept undivided until the death of my said
wife, to be worked by the slaves of my estate, and those which I
shall bequeath in this to my wife, under the control and manage-
ment of my executors ; and from and immediately after her death

I devise the said real estate in this section referred to to my sons equally, to be divided among them share and share alike, to them and their heirs forever." Two of the sons, Eugene and John, died unmarried and without issue during the life of the widow, and the question now is whether they took vested interests in the undivided lands which were transmitted to their respective heirs under the statute of distributions, or passed under the will to Thomas L. Boykin, their only surviving brother. The mother, at whose death the division was directed, is still living, and of course we can only give construction according to the facts as they exist at the present time.

The three sons, Thomas L., Eugene, and John, were *in esse* at the death of the testator, and there could be no difficulty in the construction of the clause if the lands had been given to the widow expressly for life, and "from and immediately after her death to my sons equally, to be divided," &c. It is admitted that if the terms had created an express life estate in the widow, they would have given a vested remainder in each of the sons to the extent of one undivided third. It is clear, therefore, that the alleged difficulty does not grow out of the words "to my sons equally, to be divided," and that the doctrine as to classes, in so far as it gives the right of survivorship, has no application to the case. Whatever interest was given was in severalty. 2 *Jarm. Wills* (1st Am. edit.), 162, and note.

It is contended, however, that the lands were not given to the widow or any one else during her life; that there was a chasm between the death of the testator and that of the widow, in which the lands were not given at all, or at least no such particular estate was created, as is necessary to support a vested remainder; that the devise from and after the death of the widow, was an effort to give lands *in futuro*, which could only take effect as an executory devise; in other words, that the devise was contingent upon the sons surviving the mother, and as a consequence, if the other son, Thomas L. Boykin, also should die before his mother, the whole devise would be defeated. We cannot accept this view, which, as it seems to us, would not only run counter to the manifest intention of the testator to dispose of his whole estate, but would violate the settled rules of construction applicable in such

cases. In the first place, it is not quite clear that the lands were not disposed of during the life of the widow. The will directs that they should "be kept undivided until the death of my wife, to be worked by the slaves of my estate, &c , under the management and control of the executors." This looks very much like a substantial devise to the executors during the life of the widow, for the purpose of carrying out the trusts indicated; but the provision is very peculiar, and we do not think it necessary to rest the judgment of the court on that construction.

We concur with the Circuit judge that the devise created vested interests in the sons living at the death of the testator, and only the division and possession were postponed to the death of Mrs. Boykin. Mr. Jarman says: "The law favors the vesting of estates, the effect of which principle seems to be, that property which is the subject of disposition, will belong to the object of gift immediately on the instrument taking effect, or as soon thereafter as the terms thereof will permit. As therefore a will takes effect at the death of the testator, it follows that any devise or bequest in favor of a person in *esse* simply (*i. e.*, without any intimation of a desire to suspend or postpone its operation) confers an immediately vested interest. If words of futurity are introduced into the gift, the question arises whether the expressions are inserted for the purpose of protracting *the vesting,* or point merely to the deferred possession or enjoyment. It may be stated as a general rule that where a testator creates a particular estate and then goes on to dispose of the ulterior interest, expressly in an event which will determine the prior estate, the words descriptive of such event occurring in the latter devise will be construed as referring merely to the period of the determination of the possession or enjoyment under the prior gift, and not as designed to postpone the vesting." 1 *Jarm. Wills* (1st Am. edit.), 727. Where a testator devises lands to trustees until A shall attain the age of twenty-one years, and if or when he shall attain that age, then to him in fee, this is construed as conferring on A a vested estate in fee simple, subject to the prior chattel interest given to the trustees, and consequently on A's death, under the prescribed age, the property descends to his heirs at law, though it is quite clear that a devise to A if or when

he shall attain the age of twenty-one years, standing isolated and detached from the context, would confer a contingent interest only. *Ib.*, 734.

There are directions in this will, that if any of the sons should come of age *before* the death of Mrs. Boykin, "such son or sons shall be permitted to cultivate, each for himself, such a part of the lands as shall be allotted for that purpose by my wife and executors until the final division, when he or they shall receive his or their own share." The devise also contains a provision that if any of the sons should die *before* the time appointed for division, *leaving issue*, "such issue shall take among them the same portion to which their parent would have been entitled," &c. Now one of the rules of construction adopted in this class of cases is, as it was tersely stated by Chancellor Kent: "A devise to A in fee, *if* or *when* he attains the age of twenty-one, becomes a vested remainder, provided the will contains an intermediate disposition of the estate or of the rents and profits during the minority of A, or if it directs the estate to go over in the event of A dying under age" (or before the event fixed for possession). 4 *Kent*, 205; *Cadogan* v. *Ewart*, 7 *Adol. & Ell.*, 636; *Rivers* v. *Fripp*, 4 *Rich. Eq.*, 298; *Seabrook* v. *Gregg*, 2 *S. C.*, 78; *Smither* v. *Willcox*, 9 *Ves.*, 233; 1 *Jarm. Wills*, *739.

This rule runs through all the cases which were quoted and discussed by Chancellor Dunkin in *Rivers* v. *Fripp*, and by Chief Justice Moses in *Seabrook* v. *Gregg*, *supra*, and we conceive it to be unnecessary to do more than quote what Chancellor Dunkin said in *Rivers* v. *Fripp:* "Although the reasons of this rule are various and more or less obvious, and, as might be supposed, have been received with more or less favor, the rule itself seems well settled. So from *Boraston's case*, 3 *Rep.*, 19, down to the very recent case of *Williamson* v. *Berry*, 8 *How.*, 495, words seemingly creative of a future interest, have been frequently construed to refer to the futurity of possession, and not as designed to postpone the vesting of the estate. In *Boraston's case* there was a term of eight years devised to A and B, and after the said term the land to remain to executors for the performance of his will, till such time as H should accomplish his full age of twenty-

one years, and *when* the said H should come to his age of twenty-one, *then* to him and his heirs for ever. It was held by the court that the estate was vested in H; that the adverbs of time, *when*, &c., did not make anything necessary to precede the vesting of the remainder, but merely expressed the time when it should take effect in possession," &c.

But assuming that the interests were vested, another view is suggested, that, inasmuch as the will shows that the testator intended the lands for his sons as a class, the court can and should declare cross-remainders among them, in order to effectuate that intention. As before stated, the will does provide that if any of the sons should die before their mother, *leaving issue*, such issue shall then take the share of their parent; but the will does not provide for the case of sons dying before their mother *without issue*. As that event has occurred, can the court supply the alleged omission, and declare that, the testator intended the interest of such deceased child to go to his surviving brothers, to the exclusion of his heirs at law generally? It seems to us that it would be an unauthorized liberty thus to add, from mere conjecture as to the intention of the testator, an important supplement to the provisions of his will. It is true there are such things as cross-remainders by implication, but such implication must be absolutely necessary. We fail to see in this will anything which requires such an implication. In the case of *Baldrick & Weston* v. *White*, 2 *Bail.*, 442, cited at the bar, it was held that "where in a devise to two, their several shares are limited over to third persons on the failure of issue of either of them, cross-remainders will not be implied." In the case of *Seabrook* v. *Mikell*, *Cheves Eq.*, 80, the words were, "in case my surviving son shall depart this life without issue," &c. The interests of the dead sons having vested, and, in the event which has occurred, not being limited over, must be distributed as other intestate property. See case of *Smither* v. *Willcox*, 9 *Ves.*, 234, cited in the Circuit decree.

*Second.* As to the $600 to be paid annually to the widow, &c. After giving his widow certain slaves by name, the testator directed that "they may be worked on my general estate under the control of my executors, who shall, as long as she lives, pay to her

annually out of the proceeds of my general estate the sum of six hundred dollars, in full compensation for the use, labor, and profits annually of said slaves." We think this provision ended with the emancipation of the slaves. It was expressly stated to be "in compensation for the use, labor, and profits of the slaves," and must be regarded as one of the many losses which resulted from emancipation. But we agree with the Circuit judge that the executor should have the household furniture of the widow repaired and renewed, and provide for her a suitable carriage and pair of horses. Manifestly the object nearest the testator's heart was to make his widow comfortable during her life. She promptly yielded her right of dower in a very large and valuable plantation in consideration of the provisions of the will. She lost by emancipation the $600 provided for her annually as compensation for the hire of her slaves, as well as the slaves themselves. Circumstances so changed that a change of residence became proper, to which it does not appear that the executor or any of the legatees objected. We do not see that the provision was made for the widow on condition that she continued to reside in the old family mansion, or that her change of residence absolved the executor or the estate from the legal as well as high moral obligation of providing for her in her old age as the will directs.

*Third.* As to the legacy of $2,000 in six per cent. state stocks, &c. It is in the following words: "To my wife, Sallie W. Boykin, to her and her heirs forever, I give and bequeath two thousand dollars ($2,000) in six per cent. stocks of the state of South Carolina." This was not a specific legacy of the stocks in the sense that the legatee was to have the *very thing* bequeathed, as a horse, or a ring, the destruction of which would simply be the loss of the legatee. What was given? Not stocks, but dollars; not so many particular dollars in a bag and capable of delivery, but dollars generally. One of the earliest and simplest tests of a specific legacy was to inquire whether the legacy would be adeemed if the testator, after the execution of his will, disposed of the thing given. Now, suppose Mr. Boykin, after he made his will, had disposed of all his state stocks, would that have been an ademption of this legacy? We should say not, for the reason that the thing given was not "stocks," but dollars.

Possibly it might have been an ademption if he had directed the given number of dollars paid in "my stocks now in my possession." But the provision is "in six per cent. state stocks of the state of South Carolina;" that is to say, in any stocks of the proper description, whether then in his possession or to be purchased or acquired in any other way by his executors. It does not even appear in the will that the testator owned such stocks, but if it had, that would have made no difference. "It must be observed that the mere possession of the testator at the date of his will of stocks of equal or of larger amount than the legacy will not make the bequest specific when it is given generally in particular funds without further explanation, for the testator might mean only to direct his executor to purchase with his general estate so much stocks in the fund described, and therefore that clear intention which is required for making a legacy specific does not here exist." 2 *Wms. Exrs.* (7th edit.), 1252.

The gift was in dollars; not in any particular dollars, earmarked and identified, but such a number of dollars; and that makes this what is called a demonstrative legacy. This kind of legacy, while it is specific in its nature, differs so much in effect from one properly specific that if the fund out of which it is to be repaid is called in or fail, the legatee will not be deprived of his legacy, but be permitted to receive it out of the general assets; yet the legacy is so far specific that it will not be liable to abate with general legacies upon a deficiency of assets. 2 *Wms. Exrs.*, *1043, and notes, quoting the civil law: "If the testator devise ten quarters of corn, coming of the corn which shall grow in such a soil, or two tons of wine of his grapes in such a vineyard, or ten lambs of such a flock, though so much corn or wine or so many lambs do not arise of the things aforesaid, yet the heir or executor is compelled by law to make them good *integraliter;* because he may seem to have mentioned the soil, the vineyard, and the flocks rather by way of demonstration than by way of condition. *Fulbecke's Parallele*, p. 37, edition of 1618."

The statute of limitations is not interposed by the executor or legatees. It is, however, insisted that the widow was guilty of *laches* in demanding her legacy; that she stood by and without objection saw the assets destroyed or paid to her daughters, and

especially that she acquiesced in the delivery of the stocks, intended as alleged for her, to others. It is true she waited long, but it should be kept in mind that the testator died during the war, which soon after ended, reducing greatly the value of choses, and bringing upon the country general confusion and ruin. Besides, as we can well understand, there were other reasons which naturally made the widow hesitate to seek redress in the courts. As to the state stocks, we have just determined that they were not given to her specifically, and of course she had no more right to object to the executor using them than any other choses of the estate. The legacy must therefore be paid; but as in our view it might be discharged by the delivery of "six per cent. state stocks of the state of South Carolina" to the value of two thousand dollars, we concur with the Circuit judge that it should only bear interest at *six per cent. per annum.*

The legacy being given in lieu and bar of dower is, and should be, much favored in law. It was given for a consideration, and is therefore somewhat in the nature of a debt of the testator, but we agree with the Circuit judge that it was not charged upon the lands. The will certainly does not expressly make it a charge; and we do not think that the widow is entitled to be subrogated to the rights of the daughters, whose legacies were charged upon the lands, upon the ground that they were paid in part by the state stocks. That claim can only stand upon the view that "the stocks" were specifically given to her, and their use in paying the legacies of the daughters gives her the right *pro tanto* to stand in their place and set up in her favor the right of charge given to them. The conclusive answer to this is our ruling that the state stocks were not specifically given to the widow. If the legacy were a debt of the testator pure and simple, and there were not assets to pay it, that of itself would not make it a charge upon any particular part of the estate specifically given to others, but would involve the question of general contribution by all the legatees and devisees. That question was not made in the proceedings, and we will not consider it now. The claim of the widow is so favored that it would not have to abate for the payment of debts of the estate; but it is a very different ques-

tion whether the other legatees and devisees shall abate in order to pay her legacy.

The Circuit judge, in order to settle all rights as far as he could, declared in advance upon what property the execution on the judgment herein rendered might or might not be levied. There are many questions in reference to the claims upon these lands yet to be determined, and we think it premature to decide now how, when, or upon what property that execution may be levied. We prefer to reserve our judgment upon that question until the case arises and is regularly argued.

With this slight modification as to the manner of levying the judgment and execution, the judgment of this court is that the judgment of the Circuit Court be affirmed.