MARQUETTE and BLACK agree.

---

FRED BARKER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDWARD W. THOMPSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. L. THOMPSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket. Nos. 51102, 51103, 51104. Promulgated July 11, 1933.

*Robert T. Jacob, Esq.*, for the petitioners.
*William E. Davis, Esq.*, for the respondent.

662

MARQUETTE: The petitioners contend that the principal transaction, the organization of the Columbia River Packers Association, Inc., and the transfer to it of all the assets of the Columbia River Packers Association, in exchange for cash and all of its capital stock, constituted a reorganization; that the purchase of more than two thirds of the outstanding stock of the old company at an average price of $99.98 per share established the fair market value, and that the fair market value of the shares of stock of the new company was no greater than the value of the shares of the old, less the cash distributed.

The respondent takes the position that the disposition of the assets of the old company to the new company for $1,578,600 and 17,540 shares of no par value common stock of the new company constituted a sale by the old company of its assets to the new company, and also that the fair market value of the no par common stock of the new company, as of the date of incorporation, was not less than $148.32 per share.

The pertinent provisions of the Revenue Act of 1924 are section 203 (a), which reads as follows: " Upon the sale or exchange of property the entire amount of gain or loss determined under section 202 shall be recognized, except as hereinafter provided in this section ", and the following subdivisions of section 203: (b) (3); (d) (1); (e) (1) and (2); (f); (g); and (h) (1) and (2).

In *Pinellas Ice & Cold Storage Co.*, 21 B.T.A. 425; affd., 57 Fed. (2d) 188; 287 U.S. 462, we considered the reorganization sections under the Revenue Act of 1926, the provisions of which are the same as in the 1924 Act, and we there said:

Section 203 (a) provides that when there is a sale or exchange of property the entire amount of the gain or loss shall be recognized, with certain exceptions mentioned in the other subdivisions of that section. The question for decision is whether the transaction here comes within any of those exceptions.

Generally, upon the sale or exchange of property taxable gain or loss is recognized. This is true unless the transaction comes within an exception contained in the statute. So far as the provisions of the statute pertinent here are concerned, section 203 (b) (3) and 203 (e), the exception relates to exchanges and not to sales. Section 203 (b) (3) provides that no gain or loss shall be recognized, if a corporation a party to a reorganization *exchanges* property, under the circumstances therein provided, and section 203 (e) provides that if an exchange would be within the provision of paragraph (3) subdivision (b) if it were not for the fact that money or other property were included in the transaction as a consideration. In other words, in order to come within the exception to the general provisions contained in section 203 (e) there must in the first place clearly be an exchange. This essential require-

ment must be met in any event, regardless of whether otherwise there might be a reorganization within the meaning of the statute or whether the other provisions of the statute have been met. We think it is clear that if property is sold the transaction would not come within the exchange provisions. A sale does not come within either the words or the reason of section 203 (b) (3) or 203 (e). There is a clear legal distinction between a sale and an exchange, and section 203 (b) (3) and 203 (e) relate only to *exchanges*, and not to *sales*.

The United States Supreme Court has laid down a rule long recognized and well established in law as to what constitutes a sale. That court, in the case of *Williamson* v. *Berry*, 8 How. 495, 543, stated as follows:

> \* \* \* We remark that *sale* is a word of precise legal import, both at law and in equity. It means at all times, a contract between parties, to give and to pass rights of property for money,—which the buyer pays or promises to pay to the seller for the thing bought. Noy's Max. ch. 42; Shep. Touch., 244.

The transaction before us may be summarized as follows: Thompson and Tyler learned that a large part of the stock of the old company could be purchased. They conferred with a bond house in Portland, Oregon, and were advised that a bond issue, secured by the old company's assets in the possession of a new company, could be sold to the investing public. Through such a bond issue a substantial part of the cost of the old company stock could be raised, thus leaving Thompson and Tyler in control of the stock in the new company, with comparatively small expenditure of money. Through arrangements made with the Portland bond houses, Thompson and Tyler proceeded to buy the stock of the old company. The necessary cash was temporarily advanced by banks which held the old company stock as collateral. The new company was organized, and resolutions were passed by both companies which in their formal wording would indicate a sale and purchase of the assets. The assets were transferred, the bonds issued, and the old company was paid for its assets at the rate of $90 cash and one share of stock in the new company for each share of stock in the old company. The old company then distributed the cash and stock as a liquidating dividend.

The first question for us to decide is whether this transaction was a sale or an exchange. In discussing section 203 of the Revenue Act of 1926, which is the same as the similar section of the Revenue Act of 1924, the Circuit Court of Appeals, Second Circuit, in *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937, said:

> When describing the kind of change in corporate structure that permits exemption from these taxes, section 203 does not disregard the necessity of continuity of interests under modified corporate forms. Such is the purpose of the word "reorganization" in section 203 (b) (3) of the act, 26 USCA § 934 (b) (3), where a corporation exchanges its property "solely for stock or

securities ". Such also is the nature of the " merger or consolidation " described in subdivision (h) (1) (A) where a corporation acquires a majority of the stock of another, and such is the nature of the " reorganization " described in subdivision (h) (1) (B) of section 203, 26 USCA § 934 (h) (1) (B), where a corporation transfers assets to another corporation, and the transferor, or its stockholders, immediately thereafter are in control of the transferee. The words "A recapitalization ", in subdivision (h) (1) (C) of section 203, 26 USCA § 934 (h) (1) (C), and "A mere change in * * * form * * * of organization, however, effected," in subdivision (h) (1) (D) of section 203, 26 USCA § 934 (h) (1) (D), involve the same idea.

When subdivision (h) (1) (A) included in its definition of " merger or consolidation " the " acquisition by one corporation of * * * substantially all the properties of another," it did this so that the receipt of property by the corporation surviving the merger might serve to effect a reorganization as does an acquisition of stock. Each transaction presupposed a continuance of interest on the part of the transferor in the properties transferred. Such a limitation inheres in the conventional meaning of " merger and consolidation ", and is implicit in almost every line of section 203 which we have quoted. In *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 57 Fed. (2d) 188, the Court of Appeals of the Fifth Circuit decided that a transaction almost exactly like the present was not a " merger or consolidation," but a mere sale carrying no exemption. Judge Groner's opinion in *Corbett* v. *Burnet*, 60 App.D.C. 202, 50 F (2d) 492, is in accord. In defining " reorganization," section 203 of the Revenue Act gives the widest room for all kinds of changes in corporate structure, but does not abandon the primary requisite that there must be some continuity of interest on the part of the transferor corporation or its stockholders in order to secure exemption. Reorganization presupposes continuance of business under modified corporate forms.

In discussing the meaning of the words " merger " and " consolidation " as used in the statute, the Supreme Court, in the *Pinellas* case, *supra*, said:

The paragraph in question directs—" The term ' reorganization ' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)." The words within the parenthesis may not be disregarded. They expand the meaning of " merger " or " consolidation " so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation.

Since in the instant case we have the acquisition of all the assets of the old company by the new company and the same interests immediately thereafter are in control of the transferee, we are of the opinion that the transaction falls within the statutory meaning of a reorganization and the respondent's claim that it was a sale of assets should be denied.

The remaining question is, What was the fair market value, if any, of the no par value shares of the new company stock on October 31, 1924, the date on which it was received by the petitioners?

It is undisputed that the cost of the old company stock to Barker was $100 per share, and that the cost of the stock to W. L. and Edward W. Thompson was $99.98 per share. The respondent in his deficiency notice determined the new company stock to have a fair market value of $148.32 per share. This value reflects the book value of the new company stock after the assets had been transferred. These same assets reflected on the books of the old company immediately before the transfer show a book value of $183.32 per share.

The respondent contends that the book value of the stock of the new company more correctly reflects the value of the stock than did the sale of the stock of the old company immediately before the transfer of the assets. We are confronted with a situation where a group who had been in control of a corporation for a great many years sell about two thirds of the stock at an average price of $99.98 per share. The selling group were experienced in the industry and thought that they were getting an adequate price for their stock. The purchasing group were bankers, unfamiliar with the salmon-packing industry. Their first corporate step was to negotiate a $1,250,000 bond issue. An appraisal of the assets was made. We cannot help but feel that the appraisal was made primarily to support the sale of the bonds. All the assets were transferred directly from one corporation to another corporation, specifically organized for the sole purpose of taking over the properties, the business and the operations of the expiring company. There was no interruption in the continuity of existence, and no essential change in the corporate structure, except as was reflected by the flotation of a bond issue and the distribution of a cash dividend.

There was a sale of the old company stock at $99.98 per share when its book value was $183.32. The same assets burdened with a bond issue of $1,250,000 on the books of the new company show a value of $148.32 per share. A few random sales of stock were made several months after the basic date at an average price of $60 per share, but we do not think they are representative of the fair market value of the stock at the time of this transaction. We are of the opinion that the sale of the old company stock is more determinative of the fair market value than either the book value or the subsequent sales, and from a consideration of all the evidence we think that the fair market value of the stock of the new company at the time it was received was $10 per share, and we so hold.

*Decision will be entered under Rule 50.*