CENTRAL NATIONAL BANK OF LINCOLN, NEBRASKA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59285. Promulgated January 10, 1934.

*C. Petrus Peterson, Esq.*, and *Wm. C. Dorsey, Esq.*, for the petitioner.

*Philip M. Clark, Esq.*, for the respondent.

720

722

724

OPINION.

MATTHEWS: A motion to dismiss this proceeding for lack of jurisdiction was filed by respondent prior to the expiration of the time for filing his answer.  A hearing was had on the motion and upon consideration it was denied for the reason that under the authorities, *National Bank* v. *Insurance Co.*, 104 U.S. 54; *Central Natl. Bank of Missouri*, 11 B.T.A. 1017, a national bank which goes into voluntary liquidation continues to exist as a body corporate, capable of suing or being sued until its affairs are completely settled.

The petitioner contends that the transaction set forth in our findings of fact was a "reorganization" within the meaning of the Revenue Act of 1928 and, as such, nontaxable. The pertinent provisions of the Revenue Act of 1928, which are applicable here, are set out in the margin.[1]

Petitioner argues that, as a party to a reorganization, it exchanged its assets for 500 shares of stock in the First National at an agreed valuation of $110,000, plus $290,000 in cash, which under the plan of reorganization the petitioner distributed to its stockholders in liquidation. The respondent contends that the transaction was a sale by petitioner of its assets for $400,000 cash and that on such transaction a gain of $70,549.29 was realized, relying on sections 111 (a) and 112 (a), (b) (4), and (d) (1). The sum in question represents the amount agreed upon by petitioner and the First National in the transfer as value of petitioner's good will. Petitioner contends in the alternative that even if this were not a reorganization, but a sale, the sum in question did not represent gain to petitioner, but the consideration paid by the First National for petitioner's good will, alleged to have a value not less than this sum on March 1, 1913. Respondent in his determination allowed no March 1, 1913, value for good will.

---

[1] Sec. 112.(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges solely in kind.*— * * *

* * * * * *

(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

* * * * * *

(d) *Same—gain of corporation.*—If an exchange would be within the provisions of subsection (b) (4) of this section if it were not for the fact that the property received in exchange consists not only of stock or securities permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then—

(1) If the corporation receiving such other property or money distributes it in pursuance of the plan of reorganization, no gain to the corporation shall be recognized from the exchange, but

* * * * * *

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

1. We shall consider the nature of the transfer first, for, if petitioner is correct in its contention on this score, we need not trouble with the second question. The respondent bases his contention that the transaction was a sale on the rule laid down by the Supreme Court in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462. In that case all of the petitioner's assets were transferred by a contract of sale to a corporation which paid over to petitioner about one third of the purchase price in cash and gave petitioner short term promissory notes for the balance. Petitioner distributed to its stockholders the cash received and the proceeds of the notes as they were paid. The petitioner sought to bring this within the reorganization provisions of the Revenue Act of 1926, but the Supreme Court, affirming the court below and this Board, held that short-term notes " were not securities within the intendment of the act and were properly regarded as the equivalent of cash." Since the petitioner exchanged its property not " solely for stock or securities in another corporation a party to the reorganization " (§203 (b) (3) ), for petitioner received cash and notes, and not for stock or securities and " also * * * other property or money " (within the proviso of §203 (e), the notes being obviously not " stock " and not reasonably to be regarded as " securities "), it followed that the transaction did not fall within the reorganization provisions exempting from taxation on exchanges and would therefore reflect a taxable gain. The acceptance of a contrary view, it was said, "would make evasion of taxation very easy."

Was that the situation here? The corresponding provisions of the 1928 Revenue Act, section 112 (b) (4), (c), and (d), are identical with those of the Revenue Act of 1926.

Petitioner relies upon *Stock Yards Bank of Cincinnati*, 25 B.T.A. 964, where an Ohio bank, forbidden by law to purchase stock of any other bank in the state, appointed nominees, lent them cash without interest, and authorized them to buy all the capital stock, at $400 a share, of another Ohio bank. When this had been done, the purchasing bank took over all the assets and liabilities of the selling bank and liquidated it. The Board held that, while the purchase of the petitioner bank's stock might have been an *ultra vires* act under state law, the purchase by the bank's nominees was in substance a purchase by the bank, and the transfer of petitioner's assets to the purchasing bank, its sole stockholder, therefore, while in form a sale of assets, was nothing more than a distribution of assets by petitioner in complete liquidation. The Board did not adopt petitioner's argument that this was a reorganization under the 1926 Revenue Act, but held for the petitioner on the ground that the transaction was nontaxable as a complete liquidation of petitioner

under section 201 (c), Revenue Act of 1926, by which the petitioner received no consideration for its assets from the purchasing bank.

When we apply the analogy of that case to the present one, we find important differences. Here there was no purchase of petitioner's stock by the First National, either directly (not permissible under the National Bank laws) or indirectly through nominees. There was executed between the two banks only one instrument, which purported to be a contract of sale and by which petitioner was to convey to the First National all its assets and First National was to assume all liabilities and pay therefor " to Central National Bank ", not to petitioner's stockholders, it will be noted, the sum of $400,000. Petitioner's stockholders (the necessary two thirds) by the same instrument were required to vote for liquidation of petitioner. First National never owned in name or fact petitioner's stock. The transfer of petitioner's assets to the First National, therefore, can scarcely be regarded as the liquidation by the First National of property over which it exercised legal ownership and control.

We pass to the next case upon which petitioner relies, *National Pipe & Foundry Co.*, 19 B.T.A. 242, in which this Board held the transaction a reorganization under the 1926 Act, and, the distribution of proceeds having been made by petitioner to its stockholders, nontaxable under section 203 (e) (1). In that case the petitioner corporation contracted to transfer its assets and liabilities to another new corporation, petitioner's preferred stockholders to receive par value for their shares, and petitioner's common stockholders to receive cash and so many shares of preferred stock in the new corporation. The cash and new shares were distributed by petitioner to its stockholders on receipt. The petitioner's stockholders in their written contract bound themselves to receive shares and cash, as stated, of the new corporation in exchange for shares and assets of petitioner. Cf. *Fred Barker*, 28 B.T.A. 657, in which, under like circumstances, we held a reorganization had been effected.

To state the *National Pipe & Foundry Co.* case is to show its variance from the case at bar. The only contract between petitioner and the First National, as stated, binds petitioner, on its part, to transfer all its assets to the First National and to liquidate itself; on the First National's part, to pay to petitioner $400,000 cash and assume petitioner's liabilities. Nothing more. No obligation is imposed on petitioner's stockholders to take any of the First National's stock. In fact, as petitioner admits, nothing appears in this contract to indicate it was anything but an outright sale of petitioner's assets for $400,000 cash. When we look at the petitioner's stockholders' agreement of the same date, we find petitioner's stockholders bind-

ing themselves, with respect to the projected " merger " and the payment to themselves of $200 a share for this stock, to vote for the sale and transfer of all of petitioner's assets to First National and to liquidate petitioner bank. Nothing whatever is said about any obligation on the part of petitioner's stockholders to take shares in First National. In the First National's stockholders' agreement, however, the stockholders of that bank bind themselves to vote an increase of 500 shares of capital stock, " to be sold to various stockholders of Central National Bank at two hundred and twenty ($220) dollars a share," and to execute waivers of their right to purchase such additional stock, " that such additional shares may be sold as above contemplated."

Chapin, vice president of petitioner and vice president of the First National after the transfer, testified that an oral but binding agreement between himself and possibly other officers and directors of petitioner, on the one part, and Easterday and others representing the First National, on the other part, had been entered into by which petitioner's stockholders were obligated to buy at the agreed figure of $220 a share all the new 500 shares issue of the First National's stock. All stockholders of petitioner were given the privilege of subscribing to one share of First National stock for every 4 shares held of petitioner's stock. And all this stock was bought by petitioner's stockholders, but not in the fixed proportion. In fact, of petitioner's 40 stockholders, 17 did not subscribe to any of the First National's stock, but the shares for which they were given the privilege of subscribing were taken by other stockholders. Chapin testified that he was the last to subscribe, and he took all the remaining unsubscribed stock in the First National, 74 shares, although he had held in petitioner only 51 shares.

Giving the full weight which the evidence justifies, therefore, to the oral agreement that petitioner's stockholders would subscribe for the additional issue of 500 shares of the First National's stock, and to their opinion that such subscription was " an essential condition " of the transfer, we still are unable to reach the conclusion from these facts for which petitioner contends, namely, that the First National paid over to petitioner $290,000 and 500 shares of its stock for petitioner's assets and good will. The purchase by the First National of petitioner's assets and good will for $400,000 and the subscription by some of petitioner's old stockholders to 500 shares of the First National's stock seem to us separable and separate transactions. Viewed in this light, it was not a reorganization, since there was no exchange of " stock or securities " and " other property or money " within the meaning of the statute.

As we are of the opinion that the transaction was a sale, in the nature of the complete sale of assets and good will by the petitioner

in the *Pinellas Ice* case, the immediate distribution by petitioner to its stockholders of the money received by it from the First National is immaterial, since section 112 (d) (1), providing that a distribution by the receiving corporation to its stockholders of " such other property or money * * * in pursuance of the plan of reorganization " shall result in no gain to the corporation, applies only to the case of a reorganization. There was here no distribution of anything in pursuance of a plan except cash. It may be pointed out that there was an immediate distribution by the petitioner to its stockholders of the cash received on the purchase price, and, as they matured, of the proceeds of the notes, in the *Pinellas* case. But this fact did not affect the Supreme Court's view in finding the transaction a sale.

It follows that the sum representing the excess over net assets of petitioner paid to petitioner by the First National, $70,549.29, was gain to petitioner, as determined by respondent, cf. *Cullen F. Thomas*, 14 B.T.A. 1341, unless it represented the fair value of petitioner's good will as of March 1, 1913, for which the First National gave consideration.

2. This brings us to the second point. Petitioner seeks by an argument based on petitioner's average invested capital and net earnings, evidence with respect to which both before and after 1913 was introduced, and also at the time of the transfer in 1929, to show that the sum in question represented petitioner's good will value as of March 1, 1913. Petitioner's witness, Clarke, president of the Omaha National Bank, testified that a rule of thumb method of valuing good will of a bank in 1913 was to take 5 percent of the bank's deposits, and by such method, the resulting computation of petitioner's good will as of March 1, 1913, was $68,100. This rate of calculation, it was said, had become 2 or 3 percent by 1929. In such fashion is explained how the natural increase of the good will from 1913 to 1929 would be offset by changed banking conditions, so as to make $70,000 seem reasonable as good will value both in 1913 and at the time of the transfer to the First National in 1929.

For the five years next preceding the basic date, 1913, petitioner's average invested capital (its capital stock being then $150,000) was $182,410.89, and the average annual net earnings were $16,649.50. If we take the period prior to 1913 and apply the customary Treasury rule of 8 to 10 percent on the average net tangible assets to determine what should be attributable to the intangible asset of good will, before capitalizing the remaining earnings at 15 to 20 percent to determine good will (cf. *Shanley & Furness, Inc.*, 21 B.T.A. 146), we find, after allowing a return on tangible net assets of 9 percent ($16,416), that very little of the average earnings can be regarded as attributable to an intangible asset. No justification of petitioner's

contention results from this method. Nor do we consider the expert testimony offered by petitioner's witness, Clarke, sufficient to show that the value of petitioner's good will on March 1, 1913, could be determined by the 5 percent of deposits method which he suggested as a basis for determining such value.

After reviewing all the evidence, we have come to the conclusion, therefore, that petitioner has not submitted sufficient evidence to overcome the presumptive correctness of respondent's determination as to the value of petitioner's good will on March 1, 1913, and we hold that gain was realized by the petitioner, therefore, in the amount of $70,549.29 in the year 1929.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH dissents.