Argued January 25; affirmed March 13; rehearing denied
April 17, 1934

# OLSEN *v.* RASMUSSEN ET AL.

(30 P. (2d) 329)

*Herbert A. Cooke* and *Frank S. Sever,* both of Portland, for appellant.

*Henry Bauer* and *W. B. Shiveley,* both of Portland, for respondents.

RAND, C. J. The plaintiffs, a brother and a sister, by their present guardian separately brought a suit in equity to vacate and annul a pretended sale of their real property by a former guardian. In one suit the plaintiff is a minor; in the other, an incompetent who is unable to manage her own affairs. The two suits were consolidated and tried together in the court be-low and will be so treated upon these appeals. The trial in each suit resulted in a decree in favor of the

plaintiff therein and against the defendant, E. M. Rasmussen, for the amount which had been reported to the probate department of the circuit court for Multnomah county as having been paid by him in the purchase of the undivided interest of each ward in the property but which, in fact, had not been paid, together with interest thereon from the date of the confirmation of the sale, and, from that portion of the decree, he has appealed.

The transaction, however, instead of being a sale of the property as reported to the probate court was, in fact, merely an exchange of one property for another and not a sale and, after it had been confirmed, Rasmussen sold and conveyed the lands so acquired by him to the various persons who were made codefendants in the suits and who are alleged to be innocent purchasers thereof for value and without notice. This claim upon their part was sustained at the trial and, since none of the parties except Rasmussen have appealed, that question is settled by the decrees for the reasons stated in *Crumbley v. Crumbley*, 94 Or. 617 (186 P. 423), and cases there cited.

The land in question was a 324-acre farm located in Washington county, Oregon. This farm was formerly owned by one Mandius Olsen, the father of the plaintiffs, and upon his death in 1918 each plaintiff acquired an undivided one-third interest therein. The remaining one-third was acquired by their mother, Julia Olsen, the three being tenants in common in the lands. Shortly following the father's death, the mother was appointed as guardian of the two children and she continued to be their guardian until her death on December 25, 1926, and it was through her and a son of hers by a former marriage, who was appointed as

guardian of the wards upon the death of the mother, that the pretended sale was made. The guardian last referred to resigned in 1929 and thereupon the present guardian was appointed.

■ The farm in question was free from all encumbrances at the time of the pretended sale except two small mortgages which had been placed thereon by a former grantor of Mandius Olsen, but both of said mortgages had been assigned of record to the two wards and, although acquired by them, the mortgages were not merged and continued to be a lien in their favor upon the lands. This farm was of the value of at least $75,000 and there was no indebtedness owing by either ward at the time of the transaction complained of. There was also upon the place at that time a valuable herd of dairy cattle, tools, machinery and other personal property of the value of several thousand dollars which was likewise unencumbered.

In August, 1926, the mother of the wards had been induced to enter into a contract with the defendant, E. M. Rasmussen, to exchange these lands for an apartment house then owned by him in the city of Portland. At the time the contract was made the apartment house property was subject to a mortgage for $72,500 and it was agreed that the mother should convey to Rasmussen her interest in the lands and that of each ward in exchange for the apartment house and that she should assume the payment of the said mortgage and should also execute and deliver to him an additional mortgage for the sum of $10,000 and accept his deed therefor subject to said mortgages as full consideration for the farm. After the making of said contract, the parties to the contract were informed that the interests of the wards in the land could not be ex-

changed by the guardian for other property, and thereupon, without abandoning the contract, the exchange was made by the filing in the probate court, first, of a petition praying for the issuance of a license to the guardian for the sale of the wards' interests in the lands. The license was issued and thereupon a pretended sale of the lands was made and it was reported that the defendant Rasmussen had bid in the interests of the wards and had paid to each of them the sum of $20,000 and, based upon this false report, the sale was confirmed. Thereupon, a second petition was filed in said probate court praying for an order that the guardian be authorized to invest in the purchase of said apartment house the sums of money which had been falsely reported as having been paid. But before the transaction was completed, the mother having died and the second guardian having been appointed, the transaction was completed through him and possession of the properties was delivered by each to the other. The evidence shows that the mother of the wards had had no business experience or training and that she had been induced to enter into the contract by Rasmussen and those with whom he was then associated. After possession of the apartment house had been taken, it was operated by the second guardian until some time in 1929, when, being unable to meet the payments then falling due under said mortgages, he resigned and said mortgages were thereupon foreclosed and Rasmussen became vested with the title to the apartment house property.

It was a general rule of the common law, based, it is said, on the right of a minor after reaching a certain age to bequeath personal property, that the nature of an infant's property must not be changed either by

a guardian or trustee out of court or by the court itself so as to convert personal property into real or real property into personal, and so it was held by the English courts that, in the absence of express statutory authorization, there could be no conversion of a minor's property except for the purpose of paying debts or supporting and educating the minor. See 1 Woerner, American Law of Guardianship, section 68, and cases cited. This rule of the common law that the real property of a minor cannot be converted save for the purpose of paying debts or for supporting and educating the minor, except as changed by statute, is still a rule of law in this state. The statutes of this state, however, permit the guardian to sell the lands of his ward for purposes other than the mere payment of debts and the support and education of the ward, but such statutes, being in derogation of the common law, are to be strictly construed and their application limited to only such purposes as are particularly specified and set forth in the statutes themselves. For the purposes so enumerated and specified in the statute, the authority exists upon compliance with the other provisions of the law. But unless the authority is found in the statute, the power to sell the lands of the ward does not exist and the sale, whether made by order of the probate court or not, is void. A sale made by authority of the statute is valid but the transaction must be an actual sale and not the mere bartering or exchange of one piece of property for another, as was done in this case. "It is a fundamental principal in the law of powers", as said in *Trutch v. Bunnell,* 11 Or. 58 (4 P. 588, 50 Am. Rep. 456), "that the donor of the power can exercise it only to the extent actually conferred, and as conferred". The word "sale" was held in

*Brown v. Laird,* 134 Or. 150 (291 P. 352, 73 A. L. R. 877), to mean "the transfer or passing of title in exchange for money, preferably paid in cash, or for some future credit arrangement, such as a note, or the like". "Sale is a word of precise legal import, both at law and in equity. It means at all times a contract between parties to give and to pass rights of property for money which the buyer pays or promises to pay to the seller for the thing bought and sold.": *Williamson v. Berry,* 8 How. 495, 544; *Coulter v. Portland Trust Co.,* 20 Or. 469 (26 P. 565, 27 P. 266). Again, in the last cited case, it was held that: "a power to sell and convey is prima facie a power to sell for money, usually for cash paid", and that to give any other meaning to the word "sale" there must be some usage or custom in the country where the power is to be exercised which modifies the prima facie significance of the power conferred. That the power of a guardian to sell the lands of his ward does not include the power to barter or exchange such lands for other property is clearly and overwhelmingly established by the great weight of authority in other jurisdictions as well as our own: *Trimboli v. Kinkel,* 226 N. Y. 147 (123 N. E. 205, 5 A. L. R. 1385); *Perkins v. Middleton,* 68 Okla. 1 (166 P. 1104); *Meyer v. Rousseau,* 47 Ark. 460 (2 S. W. 112); *Ford v. May,* 157 Ky. 830 (164 S. W. 88). See, also, note, 63 A. L. R. 1003.

 It is settled by these authorities that the powers of a probate court to sell the real estate of a ward and to reinvest the funds of such ward are purely statutory and that such court has no power to divest an infant of his title to lands except in the manner pointed out by the statute and that, unless the provisions of the statute have been strictly complied with, an order directing the sale, or a sale made thereunder,

will be void for want of jurisdiction to make the order. In the case at bar it is admitted that there was no money paid for the interests of the wards, or either of them, in the lands they had inherited from their father and that the transaction was reported to the probate court as a sale that had been made for cash, when in fact no moneys whatsoever had been paid, and, based upon this false report, an order was obtained to permit the investment of such moneys in the apartment house. This was a fraud upon the court and induced the making of the orders. It was also a fraud upon each ward who have been deprived of their title to these lands without having received any compensation whatsoever therefor. In *Conklin v. La Dow,* 33 Or. 354 (54 P. 218), it was held that what a guardian ''is prohibited from doing directly he certainly cannot do indirectly, by means of a sham sale to some third person''. That ruling is applicable here. Rasmussen having induced the commission of these wrongs and having secured for himself the fruits of the wrong, equity should require him to make good the loss to the extent of the amount he claimed to have paid for the interests of the wards, and this is exactly what he was required to do by the decree from which he has appealed.

While the contract for the exchange of these lands was entered into by plaintiffs' mother and there is no intimation of bad faith upon her part, yet it may be reasonably inferred from the evidence that she was a woman of no business experience or capacity, and that she was acting in ignorance of the rights of the wards and of her lack of authority, and that she was induced to enter into the contract by Rasmussen, who has reaped the benefits of the fraud imposed upon the court and upon each ward. He having induced the

*filing* of a report showing that he had actually paid for the title he thereby acquired the sum of $20,000 to each ward, it is only equitable that he should be compelled to make good his pretended bid, without which the fraud could not have been perpetrated.

The decree, therefore, is affirmed.

BEAN, CAMPBELL and BAILEY, JJ., concur.